FILED
CHARLOTTE, NC

## UNITED STATES DISTRICT COURT

DEC 28 2012

## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

U.S. DISTRICT COURT
WESTERN DISTRICT OF NC

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. [UNDER SEAL], | Civil Action No: 3:12cv856-W |
| Plaintiff, | **COMPLAINT** |
| v. | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** |
| [UNDER SEAL], | |
| Defendant. | |

## DOCUMENT TO BE KEPT UNDER SEAL

## DO NOT ENTER ON PACER

Peter W. Chatfield
Molly Beth Knobler
PHILLIPS & COHEN, LLP
2000 Massachusetts Ave, N.W.
Washington, D.C. 20036
Tel: (202) 833-4567
Fax: (202) 833-1815
E-mail: peter@phillipsandcohen.com

James F. Wyatt, III
Wyatt & Blake, LLP
435 East Morehead Street
Charlotte, NC 28202
Tel: (704) 331-0767
Fax: (704) 331-0773
E-mail: jfw@wyattlaw.net

1

FILED
CHARLOTTE, NC

DEC 2 8 2012

U.S. DISTRICT COURT
WESTERN DISTRICT OF NC

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, the STATE OF FLORIDA, the STATE OF GEORGIA, the STATE OF ILLINOIS, the STATE OF NORTH CAROLINA, the STATE OF TENNESSEE, and the STATE OF TEXAS ex rel. MICHAEL PAYNE, MELISSA CHURCH, and GLORIA PRYOR, <br><br> Plaintiffs, <br><br> v. <br><br> ADVENTIST HEALTH SYSTEM-SUNBELT, INC., UNIVERSITY COMMUNITY HOSPITAL, INC., MEMORIAL HOSPITAL-WEST VOLUSIA, INC., SOUTHWEST VOLUSIA HEALTHCARE CORPORATION, MEMORIAL HOSPITAL FLAGLER, INC., MEMORIAL HEALTH SYSTEMS, INC., TARPON SPRINGS HOSPITAL FOUNDATION, INC., FLORIDA HOSPITAL WATERMAN, INC., FLORIDA HOSPITAL ZEPHYRHILLS, INC., ADVENTIST HEALTH SYSTEM GEORGIA, INC., EMORY-ADVENTIST, INC., SHAWNEE MISSION MEDICAL CENTER, INC., MEMORIAL HOSPITAL, INC., FLETCHER HOSPITAL, INC., TAKOMA REGIONAL HOSPITAL, INC., WELLMONT HEALTH SYSTEM, ADVENTIST HEALTH PARTNERS, INC., JELLICO COMMUNITY HOSPITAL, INC., and METROPLEX ADVENTIST HOSPITAL, INC., <br><br> Defendants. | Civil Action No: "UNDER SEAL" <br><br> **COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT [31 U.S.C. § 3729 et seq.]; FLORIDA FALSE CLAIMS ACT [Fla. Stat. § 68.081 et seq.]; GEORGIA FALSE MEDICAID CLAIMS ACT [Ga. Code Ann. § 49-4-168 et seq.]; ILLINOIS FALSE CLAIMS ACT, [740 Ill. Comp. Stat. 175/1 et seq.], NORTH CAROLINA FALSE CLAIMS ACT [N.C. Gen. Stat. § 1-605 et seq.]; TENNESSEE MEDICAID FALSE CLAIMS ACT [Tenn. Code. Ann. § 71-5-181 et seq.]; AND TEXAS MEDICAID FRAUD PREVENTION ACT [Tex. Hum. Res. Code Ann. § 36.001 et seq.]** <br><br> **JURY TRIAL DEMANDED** <br><br> **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** |

2

Through their undersigned attorneys, *qui tam* plaintiffs Michael Payne, Melissa Church, and Gloria Pryor ("Relators"), on behalf of the United States of America, the State of Florida, the State of Georgia, the State of Illinois, the State of North Carolina, the State of Tennessee, and the State of Texas, for this Complaint against Defendants Adventist Health System-Sunbelt, Inc., University Community Hospital, Inc., Memorial Hospital-West Volusia, Inc., Southwest Volusia Healthcare Corporation, Memorial Hospital Flagler, Inc., Memorial Health Systems, Inc., Tarpon Springs Hospital Foundation, Inc., Florida Hospital Waterman, Inc., Florida Hospital Zephyrhills, Inc., Adventist Health System Georgia, Inc., Emory-Adventist, Inc., Shawnee Mission Medical Center, Inc., Memorial Hospital, Inc., Fletcher Hospital, Inc., Takoma Regional Hospital, Inc., Wellmont Health System, Adventist Health Partners, Inc., Jellico Community Hospital, Inc., and Metroplex Adventist Hospital, Inc., (together, the "Defendants") allege as follows:

# I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties, on behalf of the United States Government (the "United States" or the "Government") and the States of Florida, Georgia, Illinois, North Carolina, Tennessee, and Texas (the plaintiff "State Governments"), arising from false and/or fraudulent statements, records, and claims made and caused to be made by the Defendants and/or their agents and employees in violation of the federal False Claims Act, 31 U.S.C. § 3729 et seq., as amended ("the FCA" or "the Act"), the Florida False Claims Act, Fla. Stat. § 68.081 et seq., the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 et seq., the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 et seq., the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 et seq., the Tennessee Medicaid False Claims Act, Tenn. Code.

3

Ann. § 71-5-181 et seq., and the Texas Medicaid False Claims Act, Tex. Hum. Res. Code Ann. § 36.001 et seq.

2.    This *qui tam* case is brought against Defendants for knowingly defrauding the federal Government and the state Governments of Florida, Georgia, Illinois, North Carolina, Tennessee, and Texas, in connection with the Medicare, Medicaid, and other federally funded health care programs. As alleged below, for at least the past ten years, Defendants have engaged in a scheme to pay improper compensation to physicians to induce them illegally to refer patients, including Medicare and Medicaid patients, to Defendants' hospitals for inpatient and ancillary services.

3.    The compensation offered to physicians (and to some "mid-level practitioners" like nurse practitioners and physician assistants) as an inducement for referrals includes overall compensation above fair market value, as evidenced by the Defendants' substantial and consistent losses on their physician practices. Defendants tolerate such losses only because Defendants are able to recover the losses, plus substantial additional sums, by ensuring the same physicians refer their patients to Defendants' hospitals for inpatient and ancillary services. These referral-driven levels of compensation came in a variety of forms of illegal kickbacks and inducements for patient referrals including, but not limited to, hefty annual salaries paid for what often amounts to agreed or tolerated part-time and/or non-productive work; excessive bonuses often based on hospital revenue from physician referrals rather than from professional services personally performed by the referring physician (or mid-level practitioner); and Defendants' toleration of, billing Government payers for, and sharing of excess income resulting from known over-billing by employed and contracted physicians. The financial relationships between the Defendants and the physicians they employ or contract with implicate the Stark Statute, the

4

federal Anti-Kickback Statute, and various state laws and ethical canons of the medical profession.

4.  Physicians with whom Defendants have entered into illegal financial relationships that include unlawful kickbacks refer large volumes of patients, including Medicare and Medicaid patients, to Defendants' hospitals and related facilities in violation of federal law. Defendants have and continue to submit false or fraudulent claims based on these referrals to the United States to obtain millions of dollars in Medicare and Medicaid reimbursement that they are not legally entitled to receive. Under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (2009), such claims are false and/or fraudulent because the Defendants have no entitlement to payment for such unlawfully obtained referrals.

5.  Further, despite knowing that millions of dollars in payments from federal and state governments have been received in violation of the Stark Statute's prohibition on receipt of payment for services rendered despite an improper financial arrangement, Defendants have failed to refund these payments as required by the Stark statute. Under the False Claims Act, 31 U.S.C. § 3729(a)(1)(G) (2009), this constitutes a knowing and improper avoidance of an obligation to transmit money to the Government.

6.  To conceal their unlawful conduct and avoid refunding payments made on the false claims, Defendants also falsely certified, in violation of the False Claims Act, that the services identified in its annual cost reports were provided in compliance with federal law, including the prohibitions against kickbacks, illegal remuneration to physicians, and improper financial relationships with physicians. The false certifications, made with each annual cost report submitted to the government, were part of Defendants' unlawful scheme to defraud Medicare and Medicaid.

5

7.     In addition to Stark and Anti-Kickback violations, Defendants, individually and/or collectively, have engaged in additional illegal practices as set forth herein. These illegal practices include extensive and consistent upcoding of evaluation and management services, improper use of modifiers to unbundle services, improper use of modifier Q6 to seek reimbursement for physicians not yet properly certified to bill the Medicare program, improper billing for services provided by a non-physician practitioner at a physician's rate, and billing for medically unnecessary services. As a direct result of Defendants' improper practices, the federal treasury has been damaged in a substantial amount.

8.     Defendants' conduct as alleged herein violates the federal False Claims Act (FCA) and the false claims acts of the states of Florida, Georgia, Illinois, North Carolina, Tennessee, and Texas.

## II.     HISTORY OF THE FEDERAL FALSE CLAIMS ACT

9.     The FCA was originally enacted during the Civil War. Congress substantially amended the Act in 1986 – and, again, in 2009 and 2010 – to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it.

10.     The Act was amended in 1986 because Congress found that fraud in federal programs was pervasive and that the Act, which Congress has characterized as the primary tool for combating fraud against the federal Government, was in need of modernization. Congress intended that the 1986 amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and would encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

6

11.    Likewise, the 2009 and 2010 amendments were introduced to fill gaps in the coverage of the Act and to correct ambiguities in the drafting and misinterpretations of the intended scope of the Act that had emerged in case law in the more than 20 years that had passed since the 1986 amendments.

12.    From the 1986 amendments until May 20, 2009, the FCA prohibited, *inter alia*: (a) "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" as well as (b) "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729 (a)(1)-(2) (1986).

13.    Until May 20, 2009, "claim" was defined under the Act as "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c) (1986).

14.    As amended in the Fraud Enforcement and Recovery Act of 2009 ("FERA"), the Act now imposes liability upon any person who, *inter alia*: (A) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment of approval" or, effective June 7, 2008, (B) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729 (a)(1)(A)-(B) (2009).

15.    As amended by FERA on May 20, 2009, "claim" now is defined in the Act as "any request or demand, whether under a contract or otherwise, for money or property and

7

whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2009).

16. Additionally, pursuant to the 2009 FERA amendments, a violation of the FCA occurs when any person ". . . knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G) (2009).

17. In relevant part, the term "obligation" is defined under the Act to include: "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3) (2009).

18. Any person who violates the Act is liable for a civil penalty of between $5,500 and $11,000 for each false or fraudulent claim, plus three times the amount of the damages sustained by the United States.

19. The Act allows any person having information about false or fraudulent claims to bring an action for himself and the United States, and to share in any recovery. The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

8

20. The Florida False Claims Act, Georgia False Medicaid Claims Act, Illinois False

Claims Act, North Carolina False Claims Act, Tennessee Medicaid False Claims Act, and Texas

Medicaid Fraud Prevention Act, prohibit similar conduct as that prohibited by the Federal FCA,

allow plaintiffs to bring an action on the States' behalf, and provide analogous remedies to those

provided in the Federal FCA. As set forth below, Defendants' actions alleged in this Complaint

also constitute violations of the Florida False Claims Act, Fla. Stat. § 68.081 et seq.; the Georgia

False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 et seq.; the Illinois False Claims Act, 740

Ill. Comp. Stat. 175/1 et seq., the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 et

seq.; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq.; and the

Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 et seq.

21. Based on the foregoing federal and state FCA provisions, *qui tam* plaintiffs,

Michael Payne, Melissa Church, and Gloria Pryor, seek, through this action, to recover damages

and civil penalties arising from the Defendants' knowing fraud against the Medicare and

Medicaid programs.

## III. PARTIES

22. Plaintiff-Relator Michael Payne is a resident of Greenville, South Carolina. He is

currently employed as a Risk Manager at Defendant Fletcher Hospital, Inc. ("Park Ridge" or

"Park Ridge Health"). In this position, he is responsible for that hospital's risk management

activities as well as patient safety initiatives and the coordination of all accreditation activities.

Relator Payne has been employed by Park Ridge Health for over 9 years. Before taking on his

role as Risk Manager in February 2006, he worked as a respiratory therapist for the hospital. He

9

received his Bachelors of Science from the University of South Carolina in 1982 and a Master's of Health Sciences Administration from the Medical University of South Carolina in 1985.

23. Plaintiff-Relator Melissa Church is a resident of Old Fort, North Carolina. Relator Church has been employed by Park Ridge Health for over 15 years. She is currently employed as the Executive Director of Physician Services at Defendant Park Ridge Health. In this position she is responsible for supervising and coordinating the operations of Park Ridge's physicians' practices. Relator Church has been in this position for approximately 6 years. Previously, she was the director of nine inpatient and/or outpatient departments within Park Ridge Health. She has significant clinical skills as well as management and billing experience in both the inpatient and outpatient hospital settings. She received her Bachelor of Science from Appalachian State University in 1996.

24. Plaintiff-Relator Gloria Pryor is a resident of Hendersonville, North Carolina. She is currently employed as a Compliance Officer for Physician Offices at Defendant Park Ridge Health. In this position she is responsible for conducting internal compliance audits, providing education and counseling to providers to prepare them for auditing, and providing education to coders and billing office staff. Relator Pryor has been in this position for approximately 19 years, having worked previously as a licensed nurse. She was licensed as a practical nurse in 1981 and has obtained significant continuing education in coding and billing over the last 20 years.

25. Defendant Adventist Health System-Sunbelt, Inc. ("Adventist Health System" or "AHS") is a nonprofit 501(c)(3) organization incorporated in Florida and headquartered at 900 Hope Way, Altamonte Spring, Florida. AHS owns and operates approximately 45 hospitals, 20

10

nursing homes, and 25 home health care agencies throughout about a dozen states, largely in the southeastern United States.

26. As relevant to this complaint, AHS owns and/or operates, directly or indirectly, the following hospitals and associated medical facilities: Park Ridge Health, Takoma Regional Hospital, Jellico Community Hospital, Florida Hospital Carrollwood, Florida Hospital Tampa, Florida Hospital Deland, Florida Hospital Fish Memorial, Florida Hospital Flagler, Florida Hospital Heartland Medical Center, Florida Hospital Memorial Medical Center (previously Florida Hospital Ormond Memorial), Helen Ellis Memorial Hospital, Florida Hospital Waterman, Florida Hospital Zephyrhills, Gordon Hospital, Emory-Adventist Hospital, Shawnee Mission Medical Center, Manchester Memorial Hospital, Central Texas Medical Center, Huguley Memorial Medical Center, Metroplex Adventist Hospital, and Adventist Health Partners. All of these hospitals are referred to collectively herein as "Defendant Hospitals." At Defendant Hospitals, every Chief Executive Officer of the hospital, every Chief Financial Officer of the hospital, and all other employees within the hospital at or above the Vice-President level are employees of Adventist Health System, and not the respective hospital. Furthermore, these high-level employees frequently change assignments between and among the various AHS hospitals and the AHS corporate office.

27. Defendant Fletcher Hospital, Inc. ("Park Ridge" or "Park Ridge Health") is a direct or indirect subsidiary of Defendant Adventist Health System. It is a non-profit corporation headquartered at Howard Gap Road, Fletcher, North Carolina. According to Defendant Adventist Health System's website, Defendant Fletcher does business under several names including, but not limited to, Park Ridge Health, Park Ridge Hospital, Park Ridge Medical Associates, Southeastern Sports Medicine, Fletcher Community Hospital, Family Medicine At

11

Biltmore Park, Hope Psychiatric Services, Park Ridge Hospital Home Medical Equipment, Sleep Medicine Center of WNC, Southeastern Ortho Sports and Spine, and WNC Home Oxygen. Any references made herein to the conduct of any of the above "doing business as" entities are meant to refer to conduct of Defendant Fletcher Hospital, Inc. Fletcher Hospital Inc. d/b/a Park Ridge Health and/or as Park Ridge Hospital is a 103-bed hospital headquartered at 100 Hospital Dr., Hendersonville, North Carolina. Between January 1, 2012 and July 12, 2012, Park Ridge Health received over $45 million from Medicare and over $15 million from Medicaid. This made up 72% of revenue received by the hospital as of that date.

28. Defendant University Community Hospital, Inc. ("UCH") is a direct or indirect subsidiary of Defendant Adventist Health System. It is a non-profit corporation headquartered at 3100 E. Fletcher Ave., Tampa, Florida. According to Defendant Adventist Health System's website, Defendant UCH does business under several names including, but not limited to, Florida Hospital Carrollwood, University Community Hospital – Carrollwood, Florida Hospital Tampa, University Community Hospital, the Dr. Kiran C. Patel Research Institute, the Pepin Heart Hospital and Research Institute, Florida Hospital at Connerton Long Term Acute Care Hospital, The Breast Cancer Center At Florida Hospital Tampa, UCH Home Health Care, UCH Home Health of Pasco, University Community Health, University Community Health Long Term Acute Care Hospital at Connerton, University Community Health-Diabetes Care Institute, University Community Health-Sleep Center, and University Community Hospital Home Health. Any references made herein to the conduct of any of the above "doing business as" entities are meant to refer to conduct of Defendant UCH. UCH d/b/a Florida Hospital Carrollwood is a 120-bed medical facility headquartered at 7171 N. Dale Mabry Hwy., Tampa, Florida. Between January 1, 2012 and July 12, 2012, Florida Hospital Carrollwood received over $66 million from

12

Medicare and over \$27 million from Medicaid. This made up 39% of revenue received by the hospital as of that date. UCH d/b/a Florida Hospital Tampa is a 381-bed medical facility headquartered at 3100 E. Fletcher Ave., Tampa, Florida. Between January 1, 2012 and July 12, 2012, Florida Hospital Tampa and the Pepin Heart Hospital and Research Institute together received almost \$253 million from Medicare and over \$102 million from Medicaid. This made up 40% of the revenue received by the hospitals as of that date.

29.     Defendant Memorial Hospital-West Volusia, Inc. ("West Volusia") is a direct or indirect subsidiary of Defendant Adventist Health System. It is a non-profit corporation headquartered at 701 West Plymouth Ave., DeLand, Florida. According to Defendant Adventist Health System's website, Defendant West Volusia does business under several names including, but not limited to, Florida Hospital DeLand, DeLand Medical Associates, DeLand Medical Associates Multi-Specialty, Florida Hospital DeLand – Women's Wellness Center, Florida Hospital DeLand Cancer Institute, Florida Hospital DeLand Digestive Health Center, Florida Hospital DeLand Neurology Center, Florida Hospital DeLand Sports Medicine and Rehabilitation, Florida Hospital DeLand Victoria Imaging, Florida Hospital DeLand Victoria Laboratory, Florida Hospital DeLand Victoria Medical Park, and Florida Hospital DeLand Victoria Women's Center. Any references made herein to the conduct of any of the above "doing business as" entities are meant to refer to conduct of Defendant West Volusia. West Volusia d/b/a Florida Hospital DeLand is a 156-bed medical facility headquartered at 701 West Plymouth Ave., DeLand, Florida. Between January 1, 2012 and July 12, 2012, Florida Hospital Deland received almost \$86 million from Medicare and almost \$43 million from Medicaid. This made up 49% of the revenue received by the hospitals as of that date.

13

30. Defendant Southwest Volusia Healthcare Corporation ("Southwest Volusia") is a direct or indirect subsidiary of Defendant Adventist Health System. It is a non-profit corporation headquartered at 1055 Saxon Blvd., Orange City, Florida. According to Defendant Adventist Health System's website, Defendant Southwest Volusia does business under several names including, but not limited to, Florida Hospital Fish Memorial, Fish Memorial Hospital, Florida Hospital Fish Imaging, Florida Hospital Volusia Home Care Services, Florida Hospital West Volusia Division, Lake Mary Plastic Surgery, Southwest Volusia Medical Associates, Southwest Volusia Professional Services, and Volusia Medical Center Clinic. Any references made herein to the conduct of any of the above "doing business as" entities are meant to refer to conduct of Defendant Southwest Volusia. Southwest Volusia d/b/a Florida Hospital Fish Memorial is a 139-bed medical facility headquartered at 1055 Saxon Blvd., Orange City, Florida. Between January 1, 2012 and July 12, 2012, Florida Hospital Fish Memorial received over $82 million from Medicare and over $35 million from Medicaid. This made up 47% of the revenue received by the hospital as of that date.

31. Defendant Memorial Hospital Flagler, Inc. ("Flagler") is a direct or indirect subsidiary of Defendant Adventist Health System. It is a non-profit corporation headquartered at 60 Memorial Medical Pkwy., Palm Coast, Florida. According to Defendant Adventist Health System's website, Defendant Flagler does business under several names including, but not limited to, Florida Hospital Flagler, Family Focus Medical Center, Flagler Orthopedics and Sports Medicine, Florida Hospital Flagler Town Center Surgery, Florida Hospital Flagler Inpatient Partners, Florida Hospital Home Health, Florida Hospital HospiceCare, Florida Hospital Memorial Home Health, HospiceCare, Memorial Medical Oncology – Palm Coast, Memorial Medical Oncology Lab, Palm Coast Family Practice, Pediatrics of Palm Coast, Stuart

14

F. Meyer Hospice House, and Urgent Care Florida Hospital Flagler. Any references made herein to the conduct of any of the above "doing business as" entities are meant to refer to conduct of Defendant Flagler. Flagler d/b/a Florida Hospital Flagler is a 99-bed medical facility headquartered at 60 Memorial Medical Pkwy., Palm Coast, Florida. Between January 1, 2012 and July 12, 2012, Florida Hospital Flagler received over $101 million from Medicare and over $22 million from Medicaid. This made up 55% of the revenue received by the hospital as of that date.

32.     Defendant AHS d/b/a Florida Hospital Heartland Medical Center ("Heartland") is a non-profit 160-bed medical center headquartered at 4200 Sun 'n Lake Blvd., Sebring, Florida. It serves as the flagship facility of the Florida Hospital Heartland division of Adventist Health System. According to Defendant Adventist Health System's website, Defendant Adventist Health System does business under several names including but not limited to Florida Hospital Heartland Medical Center and Florida Hospital Heartland Medical Center Lake Placid. Florida Hospital Heartland Medical Center itself does business under a variety of names, including but not limited to, Florida Hospital Center for Wound Healing and Hyperbaric Medicine, Florida Hospital Child Learning Center, Florida Hospital Heartland Gastroenterology Center, Florida Hospital Heartland Health Partners, Florida Hospital Heartland Integrity Health Care, Florida Hospital Heartland Medical Center Cardiology Associates, Florida Hospital Heartland Medical Center CareNow, Florida Hospital Heartland Medical Center Center For Pain Medicine, Florida Hospital Heartland Medical Center Center For Sleep Studies, Florida Hospital Heartland Medical Center Daybreak Counseling Center of Lake Placed, Florida Hospital Heartland Medical Center Daybreak Counseling Center of Sebring, Florida Hospital Heartland Medical Center Family Medicine Center Lake Placid, Florida Hospital Heartland Medical Center Family Medicine

15

Specialists, Florida Hospital Heartland Medical Center Family Practice Center, Florida Hospital Heartland Medical Center For Infectious Disease, Florida Hospital Heartland Medical Center Gastroenterology Center Lake Placid, Florida Hospital Heartland Medical Center Gastroenterology Center Sebring, Florida Hospital Heartland Medical Center Heartland Women's Health, Florida Hospital Heartland Medical Center Highlands Surgical Associates, Florida Hospital Heartland Medical Center Highlands Surgical Associates Lake Placid, Florida Hospital Heartland Medical Center Internal Medicine Specialists, Florida Hospital Heartland Medical Center Interventional Cardiology, Florida Hospital Heartland Medical Center Neurology and Stroke Care Center, Florida Hospital Heartland Medical Center Outpatient Laboratory, Florida Hospital Heartland Medical Center Priority Health Care, Florida Hospital Heartland Medical Center Psychiatric Services, Florida Hospital Heartland Medical Center Pulmonary and Critical Care Specialists, Florida Hospital Heartland Medical Center Seascape Imaging Outpatient Center, Florida Hospital Heartland Medical Center The Center for Wound Healing and Hyperbaric Medicine, Florida Hospital Heartland Medical Center The Diabetes Center, Florida Hospital Heartland Medical Center The Therapy Center Lake Placid, Florida Hospital Heartland Medical Center The Therapy Center Sebring, Florida Hospital Heartland Medical Center Women's Wellness Center Lake Placid, Florida Hospital Heartland Medical Center Women's Wellness Center Sebring, Florida Hospital Heartland Priority Health Care, Florida Hospital Heartland Women's Wellness Center, Florida Hospital Home Care Services Sebring (d/b/a of Florida Hospital Heartland Division), Florida Hospital Wauchula Center for Sleep Studies, Florida Hospital Wauchula Hardee Family Medicine, Florida Hospital Wauchula Pioneer Medical Center, Florida Hospital Wauchula Priority Health Care, Florida Hospital Wauchula The Center for Wound Healing, Florida Hospital Wauchula The Therapy Center,

16

Florida Hospital Wauchula Women's Wellness Center, Heartland Center for Infectious Disease, Heartland Family Medicine, Heartland Home Health Services, Heartland Occupational Health Services, Heartland Pulmonary and Critical Care Specialists, and Integrity Health Care. Any references made herein to the conduct of any of the above "doing business as" entities, including Florida Hospital Heartland Medical Center, is meant to refer to conduct of Defendant AHS d/b/a Heartland. Between January 1, 2012 and July 12, 2012, AHS d/b/a Florida Hospital Heartland Medical Center received over \$220 million from Medicare and over \$49 million from Medicaid. This made up 76% of the revenue received by the hospital as of that date.

33.    Defendant Memorial Health Systems, Inc. ("Memorial Health Systems") is a direct or indirect subsidiary of Defendant Adventist Health System. It is a non-profit corporation headquartered at 301 Memorial Medical Pkwy., Daytona Beach, Florida. According to Defendant Adventist Health System's website, Defendant Memorial Health Systems does business under several names including, but not limited to, Florida Hospital Memorial Medical Center (previously known as Florida Hospital Ormond Memorial), Florida Hospital – Oceanside, Center for Neurohealth Sciences (The), Contemporary Women's Care, East Orlando Medical Group, Ehringer Medical Center, Florida Coast Surgeons, Florida Hospital Center for Wound Healing, Florida Hospital Memorial Medical Center Radiology Consultants, Florida Hospital Memorial System, Florida Hospital –Ormond Memorial, Florida Women's Health Center, Memorial Cancer Care Center, Memorial Family Care – Bellair, Memorial Family Care – Daytona Beach, Memorial Family Care – Ormond Beach, Memorial Family Care – Daytona Beach, Memorial Health Network, Memorial Heart Institute, Memorial Medical Oncology – Ormond Beach, Memorial Medlab, Memorial Outpatient Imaging Center, Memorial Surgical Care, Palm Coast Family Medicine, Peninsula Rehabilitation Center, and Port Orange

17

Rehabilitative Services. Any references made herein to the conduct of any of the above "doing business as" entities are meant to refer to conduct of Defendant Memorial Health Systems. Memorial Health Systems d/b/a Florida Hospital Memorial Medical Center is a 277-bed medical facility headquartered at 301 Memorial Medical Parkway, Daytona Beach, Florida. Between January 1, 2012 and July 12, 2012, Florida Hospital Memorial Medical Center received over \$178 million from Medicare and over \$44 million from Medicaid. This made up 53% of the revenue received by the hospital as of that date. Memorial Health Systems d/b/a Florida Hospital Oceanside is a 119-bed medical facility headquartered at 264 S. Atlantic Ave., Ormond Beach, Florida.

34.     Defendant Tarpon Springs Hospital Foundation, Inc. d/b/a Helen Ellis Memorial Hospital ("Helen Ellis") and Florida Hospital North Pinellas, is a direct or indirect subsidiary of Defendant Adventist Health System. It is a non-profit corporation headquartered at 1395 South Pinellas Ave., Tarpon Springs, Florida. Helen Ellis is a 168-bed medical facility headquartered at 1395 South Pinellas Ave., Tarpon Springs, Florida.

35.     Defendant Florida Hospital Waterman, Inc. ("Waterman") is a direct or indirect subsidiary of Defendant Adventist Health System. It is a non-profit corporation headquartered at 1000 Waterman Way, Tavares, Florida. According to Defendant Adventist Health System's website, Defendant Waterman does business under several names including, but not limited to, Behavioral Health Consultants, Center for Medical Imaging, Community Primary Health Clinic, Florida Hospital Home Infusion, Florida Hospital Waterman Home Care Services – Private Division, Florida Hospital Waterman Home Infusion, Florida Hospital Waterman Medical Equipment and Supplies, Florida Hospital Waterman Special Transportation, and Home Care Services. Any references made herein to the conduct of any of the above "doing business as"

18

entities are meant to refer to conduct of Defendant Waterman. Waterman d/b/a Florida Hospital Waterman is a 204-bed community hospital headquartered at 1000 Waterman Way, Tavares, Florida. Between January 1, 2012 and July 12, 2012, Florida Hospital Waterman received over $225 million from Medicare and over $40 million from Medicaid. This made up 59% of revenue received by the hospital as of that date.

36. Defendant Florida Hospital Zephyrhills, Inc. ("Zephyrhills") is a direct or indirect subsidiary of Defendant Adventist Health System. It is a non-profit corporation headquartered at 7050 Gall Blvd., Zephyrhills, Florida. According to Defendant Adventist Health System's website, Defendant Zephyrhills does business under several names including, but not limited to, Bay Area Urgent Care, Brooksville Therapy Center, Chapel Home Health, Chapel Home Health Hernando, East Pasco Medical Center, Florida Hospital Family Practice, Florida Hospital Medical Clinic, Florida Hospital Medical Plaza, Medical Group of Tampa Bay, Pasco Regional Hospital, The Baby Place, Wesley Chapel Family Practice, and Wesley Chapel Home Health. Any references made herein to the conduct of any of the above "doing business as" entities are meant to refer to conduct of Defendant Zephyrhills. Zephyrhills d/b/a Florida Hospital Zephyrhills is a 139-bed community hospital located at 7050 Gall Blvd., Zephyrhills, Florida. Between January 1, 2012 and July 12, 2012, Florida Hospital Zephyrhills received over $168 million from Medicare and over $29 million from Medicaid. This made up 48% of revenue received by the hospital as of that date.

37. Defendant Adventist Health System Georgia, Inc. ("AHS Georgia") is a direct or indirect subsidiary of Defendant Adventist Health System. It is a non-profit corporation with a principal office address of PO Box 12938, Calhoun, Georgia. According to Defendant Adventist Health System's website, Defendant AHS Georgia does business under several names

19

including but not limited to Gordon Hospital, Gordon Adult and Pediatric Medical Associates, Gordon Emergency Medical Services, Gordon Home Care, Gordon Physicians Group, Gordon Urgent Care – Adairsville, Gordon Urgent Care – Calhoun, Gordon Urology, North Georgia Eye Care, Northwest Georgia OB-GYN, Northwest Georgia Orthopedics & Sports Medicine, and Wellness on Wheels. Any references made herein to the conduct of any of the above "doing business as" entities are meant to refer to conduct of Defendant AHS Georgia. AHS Georgia d/b/a Gordon Hospital is a 69-bed medical facility headquartered at 1035 Red Bud Rd., Calhoun, Georgia. Between January 1, 2012 and July 12, 2012, Gordon Hospital received over $57 million from Medicare and over $28 million from Medicaid. This made up 52% of revenue received by the hospital as of that date.

38. Defendant Emory-Adventist, Inc. ("Emory-Adventist") is a direct or indirect subsidiary of Defendant Adventist Health System. It is a non-profit corporation headquartered at 3949 South Cobb Dr., Smyrna, Georgia. As part of a joint venture with Emory Healthcare, Inc. (the clinical arm of the Robert W. Woodruff Health Sciences Center of Emory University, a non-Adventist institution), Emory-Adventist operates Emory-Adventist Hospital, an 88-bed general acute-care hospital, located at 3949 South Cobb Dr., Smyrna, Georgia. Between January 1, 2012 and July 12, 2012, Emory-Adventist Hospital received over $16 million from Medicare and over $7 million from Medicaid. This made up 31% of revenue received by the hospital as of that date.

39. Defendant Shawnee Mission Medical Center, Inc. ("Shawnee Mission") is a direct or indirect subsidiary of Defendant Adventist Health System. It is a non-profit corporation headquartered at 9100 W. 74th St., Shawnee Mission, Kansas. According to Defendant Adventist Health System's website, Defendant Shawnee Mission does business under several names including, but not limited to, Corporate Care, Kansas City Center for Diagnostic Imaging,

20

Shawnee Mission Medical Group, Shawnee Mission Physicians Group, and Shawnee Mission Urgent Care Center. Any references made herein to the conduct of any of the above "doing business as" entities are meant to refer to conduct of Defendant Shawnee Mission. Defendant Shawnee Mission d/b/a Shawnee Mission Medical Center is a 504-bed hospital headquartered at 9100 W. 75th St., Shawnee Mission, Kansas. Between January 1, 2012 and July 12, 2012, Shawnee Mission Medical Center received over $220 million from Medicare and almost $50 million from Medicaid. This made up 39% of revenue received by the hospital as of that date.

40.    Defendant Memorial Hospital, Inc. ("Memorial Hospital") is a direct or indirect subsidiary of Defendant Adventist Health System. It is a non-profit corporation headquartered at 210 Marie Langdon Dr., Manchester, Kentucky. According to Defendant Adventist Health System's website, Defendant Memorial Hospital does business under several names including, but not limited to, Manchester Memorial Hospital, Care Plus Diagnostic Imaging (KY), Care Plus Work Health Solutions (KY), Clay County Physical Therapy and Fitness, Clay County Primary Care Center, ENT & Allergy Center, Family Medical Care of Clay County, Manchester Pediatrics, Manchester Pediatrics and Primary Care, Manchester Surgery Center, Martin County Home Health, Memorial Hospital Home Health, Memorial Hospital Physical Therapy, Mountain Medical Associates, Mountain Medical Associates Pediatric and Family Practice, Mountain Medical Physical Therapy, Willowbrook Women's Center, Willowbrook Women's Center and Family Practice. Any references made herein to the conduct of any of the above "doing business as" entities are meant to refer to conduct of Defendant Memorial Hospital. Defendant Memorial Hospital d/b/a Manchester Memorial Hospital is a 63-bed hospital headquartered at 210 Marie Langdon Dr., Manchester, Kentucky. Between January 1, 2012 and July 12, 2012, Manchester

21

Memorial Hospital received over $26 million from Medicare and almost $24 million from Medicaid. This made up 72% of revenue received by the hospital as of that date.

41.    Defendant Takoma Regional Hospital, Inc. ("Takoma") is a direct or indirect subsidiary of Defendant Adventist Health System. It is a non-profit corporation headquartered at 401 Takoma Ave., Greeneville, Tennessee. Takoma operates Takoma Regional Hospital, a 100-bed acute-care hospital, headquartered at 401 Takoma Ave., Greeneville, Tennessee. Since 2007, Takoma Regional Hospital has been operated as a joint venture between Adventist Health System and Wellmont Health System, a non-profit organization headquartered in Kingsport, Tennessee. Adventist health System controls 49% of the shares of the hospital while Wellmont controls the remaining 51%. However, AHS retains the right to hire high-level hospital officials such as the CEO and CFO. According to Defendant Adventist Health System's website, Defendant Takoma Regional Hospital, Inc. also does business under other names, including but not limited to, Greeneville Urgent Care and Occupational and Takoma Medical Associates.

42.    Defendant Wellmont Health System is a non-profit network of hospital and healthcare facilities headquartered in Kingsport, Tennessee. It controls 51% of the shares of Takoma Regional Hospital and thus, under the conspiracy provisions of Federal and Tennessee False Claims Acts, shares responsibility with AHS as a co-venturer and/or co-comspirator for misconduct of that hospital as alleged herein.

43.    Defendant Jellico Community Hospital, Inc. ("Jellico") is a direct or indirect subsidiary of Defendant Adventist Health System. It is a non-profit corporation headquartered at 188 Hospital Ln., Jellico, Tennessee. According to Defendant Adventist Health System's website, Defendant Jellico does business under several names including, but not limited to, Jellico Community Hospital, Care Plus Center, Care Plus Diagnostic Imaging, Care Plus Work

22

Health Solutions, Cumberland Center For Wound Healing, and Sunbelt Homecare. Any references made herein to the conduct of any of the above "doing business as" entities are meant to refer to conduct of Defendant Jellico. Defendant Jellico d/b/a Jellico Community Hospital is a 54-bed hospital headquartered at 188 Hospital Ln., Jellico, Tennessee. Between January 1, 2012 and July 12, 2012, Jellico Community Hospital received over $11 million from Medicare and almost $4 million from Medicaid. This made up 47% of revenue received by the hospital as of that date.

44.     Defendant AHS d/b/a Central Texas Medical Center is a 178-bed hospital headquartered at 1301 Wonder World Dr., San Marcos, Texas. In December 2008, Defendant AHS entered into an affiliation agreement with St. David's HealthCare under which St. David's agreed to provide clinical and other support services to Central Texas Medical Center. According to Defendant Adventist Health Systems' website, Defendant AHS also does business in Texas under several names and through several affiliates to provide services associated with Central Texas Medical Center. These names and affiliates include, but are not limited to, Central Texas Medical Center, Central Texas Medical Associates, Central Texas Ambulatory Endoscopy Center, LLC, Central Texas Medical Center Home Health, Central Texas Medical Center Hospice, Specialty Physicians of Central Texas, Central Texas General Surgeons, Central Texas Orthopaedic Specialists, Live Oak Health Partners, San Marcos M.R.I., L.P., San Marcos Nursing & Rehab Center, Inc. d/b/a Hays Nursing & Rehab Center, and San Marcos Regional M.R.I., Inc. Between January 1, 2012 and July 12, 2012, AHS d/b/a Central Texas Medical Center received almost $48 million from Medicare and over $5 million from Medicaid. This made up 35% of revenue received by the hospital as of that date.

23

45.     Defendant AHS d/b/a Huguley Memorial Medical Center ("Huguley") is a 213-bed hospital headquartered at 11801 South Freeway, Burleson, Texas. Until May 2012, Huguley Memorial Medical Center was owned and operated by Defendant Adventist Health Systems. In May 2012, Defendant AHS formed a joint venture with Texas Health Resources to own and manage that medical center. Under this joint venture agreement, Defendant Huguley continues to manage the daily activities at Huguley Memorial Medical Center, but Texas Health Resources owns a majority stake in the hospital. According to Defendant Adventist Health Systems' website, Defendant Huguley also does business in Texas under several names and through several affiliates to provide services associated with Huguley Memorial Medical Center. These names and affiliates include, but are not limited to, Huguley Hospital, Huguley Home Health, Huguley Heart Center, Huguley Health System, Huguley Fitness Center, Cardiology Physicians of Huguley, Huguley Community Care Corporation d/b/a Johnson County Care Cooperative, Huguley Medical Associates, Inc., Burleson Nursing & Rehab Center, Inc. d/b/a Huguley Nursing & Rehab Center, Huguley Nursing Center, Inc., Huguley Surgery Center, LLP d/b/a Doctor's Surgery Center at Huguley, and Texas Health Huguley, Inc.

46.     Defendant Metroplex Adventist Hospital, Inc. ("Metroplex") is a direct or indirect subsidiary of Defendant Adventist Health System. Defendant Metroplex operates Metroplex Adventist Hospital, a 220-bed hospital headquartered at 2201 S. Clear Creek Rd., Killeen, Texas. Metroplex is a non-profit corporation headquartered in Killeen, Texas. According to Defendant Adventist Health System's website, Defendant Metroplex does business under several names including, but not limited to, Cardiology of Metroplex Hospital, Home Care of Metroplex Hospital, Metroplex Health System, Metroplex Hospital, and Rollins Brook Community Hospital. Any references made herein to the conduct of any of the above "doing business as"

24

entities are meant to refer to conduct of Defendant Metroplex. (In addition, according to Defendant Adventist Health Systems' website, Defendant Adventist Health System does business in Texas under several names and through several affiliates to provide services associated with Metroplex Adventist Hospital. These names and affiliates include but are not limited to: Metroplex Adventist CRNA, Metroplex Affiliated Providers Network, Inc., and Metroplex Clinic Physicians, Inc. Any references made herein to the conduct of any of the above "doing business as" entities are meant to refer to conduct of Defendant Adventist Health Systems.) Between January 1, 2012 and July 12, 2012, Metroplex d/b/a Metroplex Adventist Hospital received over $86 million from Medicare and over $34 million from Medicaid. This made up 46% of revenue received by the hospital as of that date.

47. Defendant Adventist Health Partners, Inc. ("Adventist Health Partners") is a direct or indirect subsidiary of Defendant Adventist Health System. It is a non-profit corporation headquartered in Illinois. Adventist Health Partners is a large physician group of over 190 doctors in primary and specialty care, operating out of more than 50 locations. According to Defendant Adventist Health System's website, Defendant Adventist Health Partners does business under several names including but not limited to Adventist Midwest Geriatrics Specialists and Vascular and Interventional Radiology. Any references made herein to the conduct of any of the above "doing business as" entities are meant to refer to conduct of Defendant Adventist Health Partners.

## IV.  JURISDICTION AND VENUE

48. This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

25

49. Although such issue is no longer jurisdictional under the 2010 amendments to the FCA, to Relators' knowledge, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 U.S.C. § 3730(e). Moreover, whether or not such a disclosure has occurred, Relators would qualify under that section of the FCA as an "original source" of the allegations in this Complaint. Before filing this action, Relators voluntarily disclosed and provided to the Government the information on which the allegations or transactions in this action are based. Additionally, Relators have knowledge about the misconduct alleged herein that is independent of, and that would materially add to, any publicly disclosed allegations or transactions that may prove to have occurred without their knowledge.

50. This court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process, because Defendants are related corporate entities (and/or a co-venturer and co-conspirator with one or more of the AHS corporate entities named as defendants herein) that have engaged in concerted misconduct as alleged herein, and because all Defendants have minimum contacts with the United States. Moreover, one or more Defendants can be found in and transact substantial business in the Western District of North Carolina, including business related to Defendants' concerted misconduct.

51. Venue is proper in the Western District of North Carolina pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants are related AHS corporate entities (and/or a co-venturer and co-conspirator with one or more of the AHS corporate entities named as defendants herein) that have engaged in concerted misconduct as alleged herein. Venue is also proper in this district because one or more Defendants can be found in and

26

transacts business in this District, including business related to Defendants' concerted misconduct.

# V. APPLICABLE FEDERAL HEALTHCARE PROGRAMS AND LAWS

## A. The Medicare Program

52. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program. Medicare is a federally-funded health insurance program primarily benefiting the elderly. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. See 42 U.S.C. § 426 et seq. The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

53. Part A of the Medicare Program, the Basic Plan of Hospital Insurance, authorizes payment for institutional care, including inpatient hospital services and post-hospital nursing facility care. See 42 U.S.C. §§ 1395c-1395i-4.

54. Part B of the Medicare Program, the Voluntary Supplemental Insurance Plan, covers outpatient and ambulatory services as well as services performed by physicians and certain other health care providers, whether inpatient or outpatient. 42 C.F.R. § 410.3.

55. To assist in the administration of Medicare Part A, CMS historically has contracted with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, have been responsible for processing and paying claims and auditing cost reports. To assist in the administration of Medicare Part B, CMS contracted with "carriers." Carriers, typically insurance companies, have been responsible for processing and paying Part B

27

claims. Beginning in November 2006, Medicare Administrative Contractors ("MACs") began

replacing both the carriers and fiscal intermediaries. See Fed. Reg. 67960, 68181 (Nov. 2006).

The MACs generally act on behalf of CMS to process and pay Part A and Part B claims and

perform administrative functions on a regional level. See 42 § C.F.R. 421.5(b).

## 1. **Background on Hospital Reimbursement**

56.     Generally speaking, hospitals are reimbursed under Medicare Part A for providing

services to inpatients. Under the Medicare Part B benefit, hospitals may also be reimbursed for

providing services to outpatients. Reimbursement is available under Part B for diagnostic

services (those used to determine a diagnosis for a patient such as diagnostic x-rays) and

therapeutic services (those that aid a physician in treatment of a patient such as clinic services).

57.     Since 1983, Medicare, Medicaid, and other federally-funded health insurance

programs have reimbursed hospitals for inpatient care and emergency department encounters

through a prospective payment system based on classification of patients through Diagnosis

Related Groups (DRGs). A DRG is a patient classification reimbursement code that is

determined based upon the patient's principal diagnosis, ICD diagnoses, gender, age, sex,

treatment procedure, discharge status, and the presence of complications or comorbidities. The

objective of these classifications is to reimburse hospitals for providing health care services to a

patient based on the type of patient the hospital is treating and the costs typically incurred by a

similarly situated (and reasonably efficient) hospital that is treating a similarly situated patient.

58.     A growing number of hospitals also offer outpatient services through what are

known as "provider-based" physicians' offices. Payments to hospitals for these outpatient

services are made based on the Outpatient Prospective Payment System (OPPS). OPPS

payments are based on Ambulatory Payment Classification (APC) groups. Services within an

APC are similar clinically and require similar resource use. "Addendum B," published by CMS, lists all HCPCS/CPT codes and the APC, status indicator, national payment amount, and coinsurance amount assigned to each code. The APC payment amount, often known as the "technical component" or "facility fee," like DRG payments, is separate from, and in addition to, the professional fee billed for services rendered by physicians to individual patients.

59.    In order for a hospital to bill for outpatient services under the APC reimbursement model, the billing practice must qualify as "provider based" according to strict federal regulations. *See* 42 CFR § 413.65. Among other things, the practice must operate under the same license as the hospital, the practice's clinical services must be integrated with those of the hospital, the practice's finances must be integrated with the hospital's, and the practice must be held out to the public as a part of the provider. *Id.* If all provider-based regulatory requirements are met, payment for outpatient services may be made under the APC model. It is the hospital, therefore, that is entitled to the APC payment (the "technical" or "facility" fee). Physicians remain entitled to separate payments for their professional services.

60.    When services are rendered in an independent physician's office, or by a hospital-owned practice group that does not qualify as provider-based, Medicare will reimburse the billing entity through a single payment based on the physician fee schedule. This single payment will be higher than the professional fee reimbursed to physicians billing in provider-based facilities because it is intended to cover the office's overhead in addition to the physician's professional services. Many hospitals are eager to acquire practices and set them up as provider-based facilities because, on average, the overall reimbursement from Medicare to provider-based facilities is higher than the reimbursement for the same service to independent physician offices.

61.     The following Defendant Hospitals have provider-based practices: Park Ridge Health, Takoma Regional Hospital, Florida Hospital Deland, Florida Hospital Fish Memorial, Florida Hospital Flagler, Florida Hospital Heartland Medical Center, Florida Hospital Memorial Medical Center, Florida Hospital Zephyrhills, and Manchester Memorial Hospital. When patients are seen at the provider-based facilities at these hospitals, two bills are submitted to Medicare: one for any APC payment due and one for the professional services of the rendering physician.

62.     The remaining Defendant Hospitals employ physicians in hospital-owned practices that do not qualify for provider-based billing. As such, when patients receive services at these hospital-owned facilities, a single bill is submitted to Medicare.

63.     Medicare enters into provider agreements with hospitals to establish the hospital's eligibility to participate in the Medicare program. However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients.

64.     As detailed below, Defendants submitted claims for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

65.     As a prerequisite to payment, CMS requires hospitals to submit annually a Form CMS-2552 (previously form HCFA-2552), more commonly known as the Hospital Cost Report. Cost reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

66.     Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

67. For all relevant years, the responsible provider official was required to certify, and did certify, in pertinent part:

> [T]o the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

68. For the entire period at issue, the hospital cost report certification page also included the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

69. Thus, the provider is required to certify that the filed hospital cost report is (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Anti-Kickback and Stark Statutes (described below).

## 2. General Rules for Billing Physician Services

70. Under Medicare rules, physician services are reimbursed through a payment system called the Resource Based Relative Value Scale ("RBRVS"). In the RBRVS system, payments for medical services and procedures are determined by the resource costs needed to

31

provide them. Payments are calculated by multiplying a standardized measure of the amount of resources the service or procedure is expected to require by a region-specific payment rate (conversion factor).

71.     RBRVS payments are based on the Healthcare Common Procedure Coding System ("HCPCS"). HCPCS is a standardized coding system designed to ensure that Medicare, Medicaid and other federal and state-funded health care programs pay for services rendered to patients by physicians and other healthcare professionals in accordance with payment schedules tied to the level of professional effort required to render classes or types of medical care. To ensure uniform descriptions of medical care rendered and consistent compensation for similar work, Government-funded healthcare programs tie levels of reimbursement to these standardized codes.

72.     The Current Procedural Terminology ("CPT") codes are a subset of the HCPCS codes (called Level I codes) and are published and updated annually by the American Medical Association. Base CPT codes are five-digit numbers organized in numeric sequences that identify both the general area of medicine to which a procedure relates (such as "Evaluation and Management," "Anesthesiology," "Surgery," "Radiology," or general "Medicine") and the medical services and procedures commonly performed by physicians working in that field.

73.     Physicians typically submit claims to Medicare and Medicaid for professional services on Form CMS-1500. Alternatively, many physicians employed by hospitals may assign their right to bill for their services to the hospital in return for a compensation package. In such a case, the hospital will bill for the physician's services. Either way, the claim form sets forth the diagnostic code describing the patient's presenting condition and the procedural codes. On the

32

claim form, the physician certifies that the services were "medically indicated and necessary to the health of the patient...."

74. Medicare will only pay for services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A).

75. The medical necessity requirement applies not only to the fact of treatment, but also to the level of treatment provided to the patient. Medicare will not pay for more expensive services if only less expensive services were medically necessary. For physician services, "medical necessity of a service is the overarching criterion" for determining which CPT code is appropriate. See Medicare Claims Processing Manual, Chapter 12 § 30.6.1(A).

76. Although CPT codes are used by Medicare to determine the appropriate levels of reimbursement for specific medical procedures and services, those codes are not intended to substitute for adequate documentation in a patient's medical record of all medical services rendered. In part to establish that care was appropriately rendered and medically necessary, patient medical records must also document the reason for the patient encounter and relevant history, physician examination findings and prior diagnostic test results; assessment, clinical impression or diagnosis; plan for care; time and date; and legible identity of the provider. The patient's progress, response to and changes in treatment, and revision of diagnosis should also be documented. If not documented, the rationale for ordering diagnostic and other ancillary services should be easily inferred, and past and present diagnoses should be accessible. The documentation must support the CPT codes reported on the health insurance forms. See CMS's 2010 Evaluation and Management Services Guide, at 4.

77. Although documentation is important, the "volume of documentation should not be the primary influence upon which a specific level of service is billed." Medicare Claims

33

Processing Manual, Chapter 12 § 30.6.1(A). Instead, the level of service should be determined based on the nature and severity of the patient's problem(s) and the required course of treatment, as determined through exercise of the physician's honest medical judgment, unclouded by personal financial interest.

### 3.  Specific Billing Rules

#### i.  Billing for Evaluation and Management Services

78.  Under the CPT coding system, standard office visits – whether conducted in a physician office, in a hospital, or in another setting – are classified as Evaluation and Management ("E&M") services. Each category of E&M codes (e.g., office visits, hospital visits, consultations) has a range of codes (e.g., 99201 to 99205 for new patient office visits), reflecting a range of intensity of services provided. Higher level codes indicate a more intensive service. Accordingly, providers are paid more for a higher level code (e.g., 99205) than a lower code (e.g., 99201).

79.  In 1995, 1997, and 2008, CMS issued Documentation Guidelines for E&M Services. To determine the appropriate level of E&M services to be coded, seven components must be assessed. These components are: (1) patient history; (2) physical examination; (3) medical decision making; (4) counseling; (5) coordination of care; (6) the nature of the presenting problem; and (7) the time involved in meeting with the patient.

80.  The first three components of the assessment (patient history, physical examination, and medical decision making) are the most important elements for coding purposes. The greater the intensity of the history, examination, and medical decision making components, the higher the level of CPT E&M code that may be assigned.

34

81. The "patient history" component of the E&M visit includes documentation of some or all of the following elements: (a) the patient's chief complaint ("CC"); (b) history of the patient's present illness ("HPI"); (c) review of the patient's systems ("ROS"); and (d) the patient's past, family, and/or social history ("PSFH"). The more extensive the patient history that must be explored and considered in order to render care, the better the justification for increasing the coding level of the E&M visit.

82. There are two types of examinations that can be performed during an E&M visit: (a) a general multi-system examination; or (b) a single organ system examination. A general multi-system examination involves the examination of one or more of the following areas: (a) Constitutional Symptoms (e.g., fever, weight loss); (b) Eyes; (c) Ears, Nose, Mouth, Throat; (d) Neck; (e) Respiratory; (f) Cardiovascular; (g) Chest (breasts); (h) Gastrointestinal; (i) Genitourinary; (j) Lymphatic; (k) Musculoskeletal; (l) Integumentary; (m) Neurological; and (n) Psychiatric. A single organ system examination, on the other hand, involves a more extensive examination of a specific organ system. Although a single organ system examination includes examination of a range of systems, the elements of the examination are more closely tailored to address problems related to a dysfunction of the primary system.

83. Typically, E&M visits that occur under circumstances that warrant a multi-system examination are properly billed at a higher level than those that warrant only a single organ system examination, unless that one system review requires an unusually extensive and in-depth review of that single organ system. Documentation of the visit must, however, provide information sufficient to indicate the medical necessity of high level examination efforts.

84. The last of the three primary elements that determine the CPT level of an E&M service is the complexity of the medical decision making required. This element measures the

35

complexity of establishing a diagnosis or selecting a management option, and is based on the following three factors: (a) the number of possible diagnoses and/or the number of management options that must be considered; (b) the amount or complexity of medical records, diagnostic tests, and other material reviewed and/or other information that must be obtained, reviewed and analyzed; and (c) the risk of significant complications, morbidity, or mortality, as well as comorbidities associated with the patient's presenting problem(s), the diagnostic procedure(s), and the possible management options. As with the history and examination, the physician may not exaggerate the complexity of decision making simply to raise the level of the CPT code and increase compensation.

### ii.     Billing of Modifiers 25 and 59

85.     Generally, when a physician performs a procedure, all usual preoperative and postoperative care associated with the procedure is reimbursed through a single global payment. CMS Pub. 100-04, Chapter 12, § 40.2. All services integral to accomplishing the procedure are considered bundled into that procedure. Therefore, reimbursement for all such services is included in the reimbursement rate that has been established for the comprehensive procedure code. This includes the usual pre- and postoperative care generally associated with any procedure.

86.     In some cases, separate payment may be made for separately identifiable evaluation and management services provided on the same day of a procedure by the same physician who performed the procedure. Billing separately for E&M services during a single patient visit is permitted only when the patient's condition requires a significant, separately identifiable evaluation and management service above and beyond the usual preoperative and postoperative care associated with the procedure or service performed. In these circumstances,

36

modifier "-25" should be added to the appropriate level of evaluation and management service provided. Id.

87. When modifier "-25" is used to seek reimbursement for a separate E&M service, both the medically necessary E&M service and the procedure must be appropriately and sufficiently documented by the physician or qualified non-physician practitioner in the patient's medical record to support the claim for the services. CMS Pub. 100-04, Chapter 12, § 30.6.6.

88. Just as modifier "-25" may be used to signify that a distinct E&M service has been provided, modifier "-59" is intended to be used to indicate that a physician has provided a procedural service distinct or independent from other procedural services performed on the same day. Because multiple procedural services provided to a patient on one day by a single provider may appear to be incorrectly coded, modifier "-59" was established to permit claims of such a nature to bypass coding edits. The addition of modifier "-59" to a procedure code is proper only when the procedure represents a distinct procedure or service from others billed on the same date of service. This may indicate a different session or patient encounter, different procedure or surgery, different site or organ system, separate incision/excision, or separate injury or area of injury (in extensive injuries). CMS Pub 100-04, Chapter 23, § 20.9.1.1.

### iii. Billing Under the Q6 Modifier

89. Physicians may retain substitute physicians to take over their practices when they are absent for reasons such as illness, vacation, continuing medical education, or pregnancy. As long as certain requirements are met, the regular physician may bill and receive payment for the substitute physician's services as if he/she had performed them. These substitute physicians are generally known as "locum tenens" physicians. They generally have no practice of their own and move from area to area as needed receiving a fixed per diem rate.

37

90. This assignment of claims and subsequent payment is permitted only if (1) the regular physician is unavailable to provide the visit services, (2) the Medicare beneficiary has arranged or seeks to receive the visit services from the regular physician, (3) the regular physician pays the locum tenens physician for his/her services on a per diem or similar fee-for-time basis, and (4) the substitute physician does not provide the visit services to Medicare patients over a continuous period of longer than 60 days. CMS Pub 100-04, Chapter 1, § 30.2.11.

91. The regular physician must identify the services as substitute physician services meeting the above requirements by entering HCPCS modifier Q6 after the appropriate procedure code.

92. It is not permissible to use a Q6 modifier to bill or collect payment for services of a physician under another physician's provider number when the above-listed conditions are not met and/or when such billing is used as a ruse to gain reimbursement for services provided by a physician who has not fulfilled or maintained legal requirements to receive and to bill and be paid under that physician's own provider number.

### iv. Billing for "Incident to" Services

93. Medicare sometimes permits physician offices to bill for services provided by a non-physician practitioner -- such as a physician assistant (PA) or a nurse practitioner (NP) -- under the physician's provider number rather than the non-physician practitioner's provider number. CMS 100-02, Chapter 15, § 60. This allows the physician's office to receive reimbursement in the amount of 100% of the physician fee schedule allowable amount, whereas non-physician practitioners are generally reimbursed at 85% of the physician fee schedule. CMS 100-04, Chapter 12, § 120. This use of a physician's provider number to bill for non-physician

38

services is referred to as "incident to" billing because the non-physician practitioner's services are rendered "incident to" the physician's services.

94. "Incident to" billing is permitted only under certain circumstances. When these circumstances are not met, a non-physician practitioner may still bill for services provided within his/her scope of practice but must do so under his/her own provider number. CMS 100-02, Chapter 15, § 60.2. This means that reimbursement by Medicare will be at 85% of the physician fee schedule.

95. In order for "incident to" billing to be appropriate, the services of the non-physician practitioner cannot be rendered in a hospital outpatient/provider-based setting. When non-physician practitioners, who are otherwise permitted to bill "incident to" the services of a physician, (i.e., NPs, CNSs, and PAs) provide services to hospital patients (either inpatient or outpatient), payment for these professional services must be paid at 85% of the physician fee schedule. CMS 100-04, Chapter 12, § 120. Therefore, "incident to" billing, i.e., billing for the service of a non-physician practitioner under the physician's provider number in order to collect reimbursement at 100% of the physician fee schedule, is never appropriate in the hospital outpatient setting.

## B. The Medicaid Program

96. Medicaid was also created in 1965 under Title XIX of the Social Security Act. Funding for Medicaid is shared between the Federal Government and those states participating in the program. Thus, under Title XIX of the Social Security Act ("Medicaid"), 42 U.S.C. § 1396 et seq., federal money is distributed to the states, which in turn provide certain medical services to the poor. Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid program. The agency must create and implement a "plan for

39

medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of the United States Department of Health and Human Services ("the Secretary"). After the Secretary approves the plan submitted by the State, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan. 42 U.S.C. § 1396b(a)(1). This reimbursement is called "federal financial participation" ("FFP").

97. The amount of federal financial participation in Medicaid spending by each state is calculated each fiscal year in accordance with a formula established under Title XIX, with FFP ranging from a low of 50% in federal funding to more than 75% in FFP, depending on a variety of factors including such things as the relative wealth of the State and its people and the total amount and kinds of expected Medicaid expenditures that are needed or expected. For example, for fiscal year 2012, the FFP for Florida was 56.04%, the FFP for Georgia was 66.16%, the FFP for Kansas was 56.91%, the FFP for Kentucky was 71.18%, the FFP for North Carolina was 65.28%, the FFP for Tennessee was 66.36%, the FFP for Texas was 58.22%, and the FFP for Illinois was 50%.

98. The Florida Agency for Health Care Administration is the state agency responsible for administration of the Florida State Medicaid Program. The Georgia Department of Community Health is the state agency responsible for administration of the Georgia State Medicaid Program. The Kansas Department of Health and Environment is the state agency responsible for administration of the Kansas State Medicaid Program. The Kentucky Cabinet for Health and Family Services is the state agency responsible for administration of the Kentucky State Medicaid Program. The North Carolina Department of Health and Human Services is the state agency responsible for administration of the North Carolina State Medicaid Program. The

40

Tennessee Department of Finance and Administration is the state agency responsible for administering the Tennessee State Medicaid Program. The Texas Health and Human Services Commission is the state agency responsible for administering the Texas State Medicaid Program. The Illinois Department of Healthcare and Family Services is the state agency responsible for administering the Illinois State Medicaid Program.

99.     Each state's Medicaid program must cover hospital services, 42 U.S.C. § 1396a(1)(A), 42 U.S.C. § 1396d(a)(1)-(2), and each program uses a cost reporting method similar to that used under Medicare.

100.    Each physician who participates in the Medicaid program must sign a Medicaid provider agreement with his or her state. Although there are variations in the agreements among the states, all states require the prospective Medicaid provider to agree that he/she will comply with all Federal and State Medicaid requirements, including the fraud and abuse provisions and the Stark and Anti-Kickback statutes. A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicaid patients.

## C.    Other Federal Health Care Programs

101.    The Federal Government administers other health care programs including, but not limited to, TRICARE, CHAMPVA, and the Federal Employee Health Benefit Program.

102.    TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces.

103.    CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100-percent service-connected disability.

41

104. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.

## D.    The Stark Statute

105. A section of the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute"), prohibits a hospital (or other entity providing healthcare items or services) from submitting claims to Medicare or Medicaid (see 42 U.S.C. § 1396b(s)) for payment based on patient referrals from physicians who have an improper "financial relationship" (as defined in the statute) with the hospital.

106. The Stark Statute establishes that providers should not submit claims for items or services referred by physicians who have improper financial relationships with the providers of the items or services. In enacting the statute, Congress found that improper financial relationships between physicians and entities to which they refer patients can compromise the physician's professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality. Congress relied on various academic studies consistently showing that physicians who had financial relationships with medical service providers used more of those providers' services than similarly situated physicians who did not have such relationships. The statute was designed specifically to reduce the loss suffered by the Medicare Program due to such increased questionable utilization of services.

107. Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship

42

with the clinical lab provider. See Omnibus Budget Reconciliation Act of 1989, Pub. Law 101-239, § 6204.

108.    In 1993, Congress amended the Stark Statute (Stark II) to cover referrals for ten additional designated health services. See Omnibus Budget Reconciliation Act of 1993, Pub. Law 103-66, § 13562, Social Security Act Amendments of 1994, Pub. Law 103-432, § 152.

109.    As of January 1, 1995, Stark II applied to patient referrals by physicians with a prohibited financial relationship for the following eleven "designated health services"; (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; (10) home health services, and (11) clinical laboratory services. See 42 U.S.C. § 1395nn(h)(6).

110.    In pertinent part, the Stark Statute provides:

(a)    Prohibition of certain referrals
(1) In general. Except as provided in subsection (b), if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then – (A) *the physician may not make a referral to the entity* for the furnishing of designated health services for which payment otherwise may be made [by Medicare or Medicaid]; and (B) *the entity may not present or cause to be presented a claim* under this title or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under (A). 42 U.S.C. § 1395nn(a)(1) (emphasis added).

111.    Therefore, a physician is prohibited from making referrals to an entity with which s/he has a financial relationship for designated health services payable by Medicare or Medicaid. In addition, providers may not bill Medicare or Medicaid for designated health services furnished as a result of a prohibited referral.

43

112. Further, *no payment may be made* by the Medicare or Medicaid programs for designated health services provided in violation of 42 U.S.C. § 1395nn(a)(1). See 42 U.S.C. §§ 1395nn(g)(1); 1396b(s).

113. Finally, if a person collects payments billed in violation of 42 U.S.C. § 1395nn(a)(1), that person *must refund those payments* on a "timely basis," defined by regulation not to exceed 60 days. See 42 U.S.C. § 1395nn(g)(2); 42 C.F.R. § 411.353(d); 42 C.F.R. § 1003.101.

114. The Stark Statute broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly to a referring physician. The statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions.

115. Compensation paid pursuant to a bona fide employment relationship may be considered proper under the Stark Statute, but only if (1) the employment is for identifiable services, (2) the amount of remuneration under the employment (i) is consistent with the fair market value of the services and (ii) is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician, and (3) the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer.

116. Compensation paid pursuant to a personal services arrangement between a hospital and a physician may also be considered proper under the Stark Statute, but only if (1) the arrangement is set out in writing, signed by the parties, and specifies the services covered by the arrangement; (2) the arrangement covers all of the services to be provided by the physician to the entity; (3) the aggregate services contracted for do not exceed those that are reasonable and necessary for the legitimate business purposes of the entity of the arrangement; (4) the term of

44

the arrangement is for at least 1 year; (5) the compensation to be paid over the term of the arrangement is to be set in advance, does not exceed the fair market value for the services, is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties (unless the agreement falls within the narrowly defined physician incentive plan), and (6) the services do not involve promoting any activity that violates state or Federal law.

117.    Employee physicians as well as those working under personal service arrangements may be compensated through "productivity bonuses" as well. However, the bonus may only be based on services personally performed by the physician.

118.    In order to qualify for the Stark Statute's exception for indirect compensation arrangements, defined as any instance where compensation flows from the entity providing designated health services through an intervening entity and then to the referral source, each of the following elements to the exception must be established: (1) there must be a written agreement, (2) the compensation must be consistent with fair market value, (3) the compensation may not take into consideration the volume or value of referrals or other business generated by the referring physician, and (4) the agreement cannot violate the Anti-Kickback Statute.

119.    Violations of Stark may subject the physician and the billing entity to exclusion from participation in federal health care programs and various financial penalties, including (a) a civil money penalty of up to $15,000 for each service included in a claim for which the entity knew or should have known that the payment should not be made; and (b) an assessment of three times the amount claimed for a service rendered pursuant to a referral the entity knows or should have known was prohibited. See 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

45

120. In sum, Stark prohibits hospitals from billing Medicare or Medicaid for certain designated health services rendered pursuant to a referral by a physician with whom the hospital has a financial relationship of any type not falling within specific statutory exemptions. 42 U.S.C. § 1395nn. Further, neither Medicare nor Medicaid may pay for any designated health services provided in violation of the Stark Statute. 42 U.S.C. § 1395nn(g)(1), 42 U.S.C. § 1396b(s). In-patient and out-patient hospital services are among the designated health services to which the Stark referral and billing prohibitions apply.

## E.    The Federal Anti-Kickback Statute

121. The Medicare and Medicaid Fraud and Abuse Statute (Anti-Kickback Statute), 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1977. The Anti-Kickback Statute arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

122. The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. § 1320a-7b(b). The statute ascribes liability to both sides of an impermissible kickback relationship.

123. Claims for reimbursement for services that result from kickbacks are rendered false under the False Claims Act. 42 U.S.C. § 1320a-7b(g)

46

124. The Anti-Kickback Statute contains statutory exceptions that exempt certain transactions from its prohibitions such as contracts for employment or personal services. The personal services safe harbor applies to payments to an agent as long as (1) the agency agreement is in writing and signed by the parties, (2) the agreement specifies all of the services that the agent is to provide for the principal, (3) if "the agency agreement is intended to provide the services of the agent on a periodic, sporadic, or part-time basis" then the agreement must specify the intervals and their schedules and charges with specificity, (4) the term of the agreement must be not less than 1 year, (5) the aggregate compensation to the agent must be set in advance, "consistent with fair-market value," and not be determined "in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties," (6) the services must not involve promotion of any activity that violates state or Federal law, and (7) the aggregate services contracted for must not exceed those reasonably necessary to accomplish the business purpose of the entity. 42 C.F.R. § 1001.952(d).

125. The employment safe harbor applies to all remuneration paid by an employer to a bona fide employee "for employment in the furnishing of any item or service for which payment may be made in whole or in part under" any Federal health care program. 42 C.F.R. § 1001.952(i). Opinions by the CMS Office of Inspector General that interpret this safe harbor provision, as well as case law enforcing it, have found that this safe harbor provides a clear-cut defense against liability for violating the Anti-Kickback Statute only where a bona fide employee is compensated exclusively for the provision of professional services that are covered by a federal health care program. Any payments to a bona fide employee that are not, in fact, made for the provision of covered professional services do not fall within the safe harbor.

47

126. The act of referring a patient to a hospital or other provider is not a covered item or service. Therefore, any payments made to an employee in order to compensate that employee for making referrals are not covered by the employee safe harbor. This is true even if the majority of an employee's compensation is for the provision of covered services. As to that portion of the payments that is made to induce referrals and to compensate for an employee's act of referring, the Anti-Kickback Statute is violated and the safe harbor does not apply.

127. Once the Government has demonstrated each element of a violation of the Anti-Kickback Statute, the burden shifts to the defendant to establish that defendant's conduct at issue was protected by a safe harbor or exception. The Government need not prove as part of its affirmative case that defendant's conduct at issue does not fit within a safe harbor.

128. Violation of the Anti-Kickback Statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. § 1320a-7(b)(7), 1320a-7a(a)(7).

129. Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under the Medicare and Medicaid programs.

130. Either pursuant to provider agreements, claim forms, or other appropriate manner, hospitals and physicians who participate in a federal health care program generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback Statute.

131. Any party convicted under the Anti-Kickback Statute must be excluded (i.e., not allowed to bill for services rendered) from federal health care programs for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1). Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider

48

from the federal health care programs for a discretionary period (in which event the Secretary must direct the relevant State agencies to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

132. The enactment of these various provisions and amendments demonstrates Congress' commitment to the fundamental principle that federal health care programs will not tolerate the payment of kickbacks. Thus, compliance with the Stark and Anti-Kickback Statutes is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare, Medicaid and other federal health care programs.

# VI.   ALLEGATIONS REGARDING DEFENDANTS' WRONGDOING

## A. Summary of Defendants' Unlawful Conduct

133.   In the late 1990's, Defendant AHS initiated an aggressive strategy to increase its control over health care delivery around its hospital locations. As part of this strategy, Adventist Health System instituted a corporate policy encouraging and directing the Defendant Hospitals, which it owned and/or managed, to purchase physician practices and/or employ physicians in the area in order to control patient referrals for both inpatient and outpatient services, including those covered by federally-funded healthcare programs as well as the designated health services listed in the Stark Statute. Subsequently, these physicians increased the number of patients, including Medicare, Medicaid, and other federally-insured patients they referred to the Defendant Hospitals for outpatient and inpatient hospital services.

134.   The Defendant Hospitals accordingly employed greater numbers of physicians and purchased physician specialty practices and brought the physicians and their staffs on as hospital employees. As employees, the physicians are required to refer patients to their

49

respective employer hospitals for inpatient and ancillary services, except in limited circumstances. In order to make employment at Defendant Hospitals more attractive to the employed physicians than maintaining their own private practices -- i.e., to keep them from terminating their contracts and returning to independent practice or working for competitor hospitals -- Defendant Hospitals have provided and continue to provide what they know to be excessive compensation, perks, and benefits to their physician employees.

135. Defendants' scheme to control referral revenue through overcompensating employed physicians as well as physicians contracted under personal service arrangements is made clear both from (a) the details of individual deals that have been struck in order to get physicians to sell their practices and sign on as Adventist employees and (b) the pattern of economic trade-offs Defendants have created and maintained between persistent losses Defendants endure in operating the purchased physician practices and the (generally) substantial gains from hospital admissions and ancillary service referrals that Defendants realize as a result of capturing nearly 100% of the referral business their employee physicians are capable of generating.

136. Consistently, year after year, Defendants Hospitals with employed physicians *lose* large sums of money on most (and, in some cases, all) of the physician practices that those hospitals own. Such losses exist because the level of income those practices generate is insufficient to sustain both (a) the substantially above-market salaries, bonuses, and other extravagant perks and benefits Defendants provide the employee-physicians whose practices Defendants purchased and (b) the other, normal operating expenses required to run those practices.

137. As stand-alone ventures, Defendant Hospitals' physician practices generally are not economically viable. In most significant part, this is so because the total package of compensation and benefits Defendant Hospitals pay the physicians who previously owned the practices, or who have been hired to operate such hospital-owned practices, is not rationally related to the income produced by those physicians while performing the professional services for which they purportedly are being paid. Moreover, such imbalance between physician practice income and expenditures exists even for Defendant Hospitals with provider-based physician practices, notwithstanding the fact that, on average across all areas in which physician reimbursement is paid, federal healthcare programs pay more reimbursement for services provided to patients by provider-based physician practices than would be paid for the same services had they been provided in physician-owned practices.

138. Defendant Hospitals are thus compensating the doctors whose practices they have purchased at levels that not only exceed what Defendants can rationally pay while maintaining a physician practice that could be economically viable on its own merits, but that even more dramatically exceed what Defendants' employee physicians could reasonably expect to earn if those physicians had continued to own and operate the business themselves.

139. Defendant Hospitals have similarly hired and over-compensated new physicians entering their geographic markets in order to secure for themselves, directly and indirectly, patient referrals that such physicians have or gain the power to control or influence.

140. At all times relevant to this action, both the Defendant Hospitals and the physicians Defendant Hospitals have employed have understood and intended that a substantial portion of the compensation that such physicians are paid and the resulting losses Defendant Hospitals are bearing on those physician practices are tolerated by Defendants only because

51

Defendants track the value of the referrals obtained from those same physicians and know that they can more than make up for those losses through the marginal gains in income that the Defendant Hospitals realize by using such arrangements to maximize the referrals the hospitals receive from those physicians for inpatient and ancillary services.

141. At all times relevant to this action, Defendants also have all realized and intended that the referrals Defendants have gained as a result of such arrangements with physicians would include referrals of Medicaid, Medicare, and other federally-insured patients.

142. Relators have significant personal experience with Park Ridge and have seen a variety of ways in which that hospital has funneled excessive compensation to its physicians. These include inflated base salaries, extravagant bonuses often based not on the personally provided services of the physician, and miscellaneous kickbacks, all designed to induce referrals to the hospital.

143. Relators are also aware that, with AHS' knowledge, encouragement and approval, many or all of these same practices – and other similarly abusive practices – are carried out at the other Defendant Hospitals. To the extent that additional compensation schemes are utilized elsewhere, the end result is clear: Defendants are making excessive and referral-volume-based payments to their employee and contract physicians for the purpose of inducing referrals of federally insured patients to Defendant Hospitals.

144. Defendant Hospitals' payments to their employed physicians constitute improper financial relationships under the Stark Statute that are not subject to any safe harbor. Such payments similarly violate federal and state Anti-Kickback Statutes.

52

145. As a result of these payments, the physicians at Defendant Hospitals have increased the number of patients, including Medicare, Medicaid, and other federally-insured patients, they referred to the Defendant Hospitals for outpatient and inpatient hospital services.

146. Defendants Hospitals knowingly submitted (and continue to submit) to Medicare, Medicaid, and other federal health care programs claims for reimbursement and claims for interim payment on annual hospital cost reports covering at least the past 10 year for the medical services provided as a result of these referrals although the Defendant Hospitals knew that the claims were not properly payable and should not have been submitted under the applicable laws and regulations.

147. On each annual hospital cost report Defendant Hospitals have filed over the past 10 years, the Defendant Hospitals have falsely certified that the medical services identified therein were provided in compliance with all applicable laws and regulations.

148. In addition, as set forth more fully below, many of the Defendant Hospitals also permit rampant overbilling by their employee physicians and submit claims for reimbursement to Medicare and Medicaid in reckless disregard or with deliberate ignorance of the fact that many are improperly billed and falsely certified.

149. The respective executives at the Defendant Hospitals know that many of their employee physicians have had and continue to have consistent upcoding and overbilling issues that have led to overcompensation by Medicare and Medicaid, but they have refused to correct these issues both out of concern that doing so would strain hospital relations with their referring doctors and because the hospitals themselves directly and indirectly benefit from the overcharges.

53

150. Such overbilling includes systematic upcoding of E&M codes, improper use of modifiers to obtain reimbursement when it was not properly due, improper billing of non-physician practitioner services under the practitioner's provider number, and billing for medically unnecessary services.

## B. Payments to Physicians and Other Non-Physician Practitioners to Induce Referrals in Violation of the Stark and Anti-Kickback Statutes

### 1. Overview

151. Defendant Hospitals have paid and continue to pay excessive compensation to their employee physicians, as well as physicians working under personal service arrangements, in Defendant Hospitals' medical, surgical, and primary care practices in order to retain their services and to ensure their substantial referral stream.

152. As set forth in greater detail below, these payments result in consistent and substantial losses to the hospitals on their hospital-owned physician practices. These payments thus do not reflect the fair market value of the outpatient services for which the payments purportedly compensate the physicians. Nor are the payments Defendant Hospitals make to such physicians independent of the value of the physicians' referrals. Rather, a portion of the physicians' compensation is tied directly to the volume of business that they refer to the Defendant Hospitals that employ them as regular or contract employees. Therefore, these payments create improper financial relationships between the Defendant Hospitals and their referring physicians. Further, these payments do not fall within any safe harbor. Under the Stark and Anti-Kickback Statutes, all services billed as a result of referrals from these physicians are thus improper and non-reimbursable.

153. Each physician employed by the Defendant Hospitals is generally treated as his/her own "cost center." All of the revenues from a physician's billings are credited to his/her

54

"cost center." As is described in further detail below, where a physician operates a provider-based practice, credited revenues include both the professional fees due to the physician's personally provided services and the "technical component" or "facility fee" associated with the professional service and intended by Government payors to cover the hospitals' overhead.

154. These revenue streams are credited to the physician's "cost center" and then the physician's costs are subtracted. These costs include the physician's salary, the salaries for support staff, the costs of the facility, and the hospital overhead attributable to the physician cost center. If the revenue derived from the physician's professional services and associated facility fees are not sufficient to cover these costs, the hospital will show a loss for that physician cost center.

155. Defendant Adventist Health System and the Defendant Hospitals track these losses by individual physician as well as by their respective groups:

156. *"Medical"* groups include allergy/immunology; cardiology (and its sub-specialties); dermatology; endocrinology/metabolism; genetics; geriatrics; hematology/oncology (including oncology only); hospice/palliative care; infectious disease; nephrology; neurology; non-surgical ob/gyn (including reproductive endocrinology); occupational medicine; orthopedic (nonsurgical); pediatrics (including general, adolescent medicine, allergy/immunology, cardiology, child development, critical care/intensivist, endocrinology, genetics, hematology/ oncology, infectious disease, nephrology, neurology, pulmonology, radiology, and urgent care); psychiatry (including physical medicine and rehabilitation, general, child and adolescent, and geriatric); and pulmonary medicine (including general, critical care, and general and critical care); radiation oncology; rheumatology; sleep medicine; and urgent care;

55

157. *"Primary Care"* groups include family practice (with and without obstetrics, ambulatory only, and sports medicine); internal medicine: general, ambulatory only, and pediatric); and

158. *"Surgical"* groups include all types of surgery-related practices including anesthesiology (including pain management); gastroenterology; gastroenterology and hepatology; surgical obstetrics/ gynecology (including general, gynecological oncology, and gynecology-only practice groups); surgical ophthalmology (including corneal and ref surgery, pediatric, and retina); adult and pediatric otorhinolaryngology; surgical pain management; pediatric surgery; gastroenterology; surgical podiatry; dermatology: mohs surgery; orthopedic surgery and its sub-specialties; plastic and reconstruction surgery; thoracic (primary); transplants; trauma; vascular (primary); and adult and pediatric urology.

159. As demonstrated by the chart below, Defendants' internal analysis shows that Defendant Hospitals that employ physicians directly or through contract employment mechanisms generally lose substantial amounts of money employing physicians to staff provider-based outpatient departments:

| 2012 Projected Gain/Loss Per Employed Physician | | | |
|---|---|---|---|
| **HOSPITAL** | Primary Care | Medical | Surgical |
| Park Ridge | (93,379) | (37,332) | (101,403) |
| Manchester | 205,305 | - | (183,474) |
| Takoma Regional | (82,873) | (175,247) | (77,096) |
| Adventist Health Partners | (12,934) | (138,204) | (115,607) |
| Huguley | (61,445) | - | (153,582) |
| Central Texas | (182,077) | 538,408 | (254,810) |
| Metroplex | (77,424) | (40,726) | (208,857) |
| Emory-Adventist | (108,414) | - | (703,324) |
| Gordon | (429,082) | - | (321,964) |
| Shawnee Mission | (19,381) | (185,593) | (132,598) |
| FH – Zephyrhills | (50,028) | (251,975) | (442,965) |
| FH – Carollwood | - | - | (42,000) |
| FH – Tampa | (493,386) | (160,558) | (83,788) |
| FH – DeLand | (101,380) | (253,657) | (75,354) |

| FH – Fish Memorial | (101,492) | (188,823) | (226,639) |
|---|---|---|---|
| FH – Flagler | (14,961) | (42,360) | (70,420) |
| FH – Memorial | (18,101) | 11,906 | (48,175) |
| FH –Heartland | (104,513) | (191,320) | (190,058) |
| FH – North Pinellas (aka Helen Ellis) | 24,496 | - | (211,272) |
| FH – Waterman | (14,016) | - | (235,936) |

160. Based on their history as employees of that entity, Relators know that Defendant Park Ridge has sustained such losses on its employed practices for at least the last 10 years. A "Management & Operating Income Statement" for Park Ridge's physicians shows that the hospital lost over $4.37 million in 2009, over $5 million in 2010, and planned to lose approximately $5.2 million in 2011, and $6.6 million in 2012 on its physicians. AHS corporate employees serving as administrators of Park Ridge, including current Park Ridge CFO Karsten Randolph and former Park Ridge CEO Kelly Pettijohn, have on several occasions indicated that these losses are due in large part to the overcompensation of the physicians employed by the hospital.

161. Consistent with the data contained in the chart, above, Randolph, Pettijohn and other AHS corporate employees have confirmed to Relator Church that the other AHS owned and operated hospitals with employed physicians suffer from similar losses. For example, a spreadsheet listing the "net income" of each of Flagler's physician practices shows that almost all of them were losing money as of July 31, 2012. For several of those practices this was the budgeted result.

162. Defendants are not concerned about these losses from the perspective of their business plan. This is because, in conjunction with tracking losses Defendants sustain through employment of physicians to staff outpatient departments, Defendants also track the "contribution margin" realized by Defendant Hospitals as a result of inpatient and ancillary

57

service referrals that can be traced to each employee-physician cost center and their respective groups. "Contribution margin" is the revenue from each physician cost center's referrals to his/her employing hospital for inpatient services or outpatient ancillary services (i.e., the revenue received by the Defendant Hospital when the relevant physician is the attending and/or referring physician). Controlling and capturing such referrals allows Defendant AHS and the Defendant Hospitals to ensure that their employed physicians are generating enough inpatient and ancillary service income to the hospitals to more than make up for the losses on the excessive outpatient compensation.

163. Defendants' internal analysis shows that, almost uniformly, Defendant Hospitals with employed physicians show contribution margins through patient referrals that are large enough both to offset the losses suffered because of the overcompensation of physicians employed to staff outpatient departments and to result in substantial net gains overall to Defendants.

164. While such analysis allays immediate concerns among Defendants as to the economic viability of paying employee doctors such generous salaries, Defendants remain concerned about the legal risks associated with the potential discovery by federal or state officials of the economic model that drives Defendants' business decisions in this respect. This is because Defendants understand that their own internal analyses of the economic trade-off they are making between outpatient physician practice losses and revenues Defendant Hospitals realize from associated patient referrals for inpatient and ancillary hospital services reveals that Defendants' main financial interest in owning and operating such physician practices is the income they gain from associated patient referrals.

58

165. Defendants therefore seek to limit the sharing of such economic analyses, as much as possible, to high-level corporate officers with a need to know such details.

166. Defendant AHS and the corporate officers/employees that AHS assigns to manage the Defendant Hospitals (including CEOs, CFOs, Controllers and other high-level officers of Defendant Hospitals) are involved in this economic structure and well aware of its illegality. AHS' corporate group in charge of hospitals with employed physicians, known as the "Physician Enterprise" section, closely monitors and oversees management of the relationship between Defendant Hospitals' losses on employed physicians and associated "contribution margins" Defendant Hospitals' gain in exchange.

167. Relators came to see such analytic materials because of a lapse in the maintenance of the normally close control Defendants maintain over data that compares physician practice losses to contribution margins Defendant Hospitals gain through such physician referrals. In June 2012, Kelly Pettijohn, AHS's CFO and head of the Physician Enterprise section, emailed all of the CFO's and Controllers at Defendant Hospitals to describe a new finance report format that AHS corporate would be using to track finances at each Defendant Hospital. Pettijohn explained that most of the document would be prepared by the corporate Physician Enterprise section and that it would replace the previous finance report format. Pettijohn's email indicated that AHS corporate *expects* the physician practices to be losing money and therefore has included in the report a section to "add back the physician loss" and thereby be able to determine each AHS hospital's profitability before the losses on the physician practices are considered. Further, he announced, going forward the corporate Physician Enterprise section will be supplying for each hospital's relevant practice groups (i.e., medical, surgical, and primary care) data showing that group's contribution margin.

59

168. At about the same time, Pettijohn also emailed a spreadsheet summary of the contents of those new reports -- as applied to all Defendant Hospitals -- to all AHS corporate employees acting as administrators at Defendant Hospitals. Park Ridge President Jason Wells, one of the recipients of that email, forwarded the summary spreadsheet to several mid-level management employees involved in Park Ridge's operations, including Relator Church. However, soon thereafter, Park Ridge CFO Karsten Randolph recognized that the circulated spreadsheet demonstrates that the Defendant Hospitals are, in substance, purchasing referrals by providing above-market compensation to employee physicians, and told Wells to ask all employees to whom he had forwarded the spreadsheet to "lose" them. In addition, Randolph told Jim Moore, the Finance Manager at Park Ridge and a direct report to Randolph, not to even talk about the spreadsheet with lower-level employees.

## 2. Examples of Referral-Driven Decisions at Park Ridge and Other Defendant Hospitals

169. The "contribution margin" figures tracked by AHS's Physician Enterprise section are important to Defendant Hospitals' administrations. The AHS corporate Physician Enterprise section is involved in all physician hiring and acquisition decisions. Physician Enterprise officials review and approve all such deals. Moreover, whenever Park Ridge administrators are contemplating hiring, terminating, disciplining or materially altering the compensation of a physician, they always consider that physician's ability to bring referrals to the hospital by analyzing his/her contribution margin and discuss and clear their plan of action with the Physician Enterprise section of corporate AHS. Based on the stated purpose of the Physician Enterprise section, Park Ridge's experience with such matters, and discussions with AHS corporate officers knowledgeable about such matters, Relators allege upon information and

60

belief that the Physician Enterprise section of AHS is similarly involved in such discussions at each of the other Defendant Hospitals with hospital-owned physician practices. Dr. Jay Levy, a pediatric urologist, recently negotiated an employment agreement with Park Ridge. Dr. Levy, who maintains his primary residence in another area and maintains a second home near Park Ridge, wanted to work 3 days a month at Park Ridge and to be paid at a rate of $10,000 a day. Jim Moore, Finance Manager at Park Ridge, performed a financial analysis of this proposal and found that, despite the fact that it was admittedly a "stretch from a [fair market value] perspective," the hospital could provide this level of compensation and still come out ahead financially overall. Although the net income from his employment would barely cover the hospital's cost of employing Dr. Levy even if Park Ridge credited Dr. Levy's cost center with value added to the hospital by his nurse practitioner, Park Ridge concluded that the "downstream" value of his referrals would be "substantial" because he would do 80-85% of his surgeries at the hospital if they agreed to his proposal. Therefore, Park Ridge acceded to most of Dr. Levy's demands and agreed to compensate him approximately $300,000/year for 3 days' work per month.

170. Park Ridge also recently renegotiated its employment contract with Dr. R. Christian Estes, an orthopedic surgeon, for similar reasons. Dr. Estes tendered his resignation to Park Ridge in early November 2012, and informed the hospital that he was taking a position with the Veteran's Administration. Concerned by the thought of losing Dr. Estes' annual $1.2 million "contribution margin," Park Ridge CFO Karsten Randolph instructed Relator Church to find out what it would take to convince Dr. Estes to remain employed by Park Ridge. Dr. Estes demanded an increase in base salary to $300,000/year, an additional stipend of $3,000/month for providing emergency room coverage, $1,500/month to cover his post-tax automobile costs (costs

61

which he had previously charged to the hospital pre-tax), the opportunity to bonus, and forgiveness of all outstanding debt (which came to over $190,000 at the time). In order to retain Dr. Estes' referrals, and despite the fact that the hospital was already losing a substantial amount of money employing Dr. Estes, Park Ridge officials acceded to almost all of his demands. He agreed to remain employed by Park Ridge after taking a $50,000 raise and the opportunity to take an additional annual bonus of $50,000.

171.    These kinds of economic considerations -- based on Defendants' desire to maintain "contribution margins" driven by employee physician referrals -- represent the overriding logic behind Defendants' business decisions. Such considerations drive Defendants' decisions regarding what physicians to employ, how much and in what actual and/or pretextual way to pay them, and – unfortunately, for both patients and payors like Federal and State Governments – how vigorously to insist such physicians abide by rules regarding medical necessity and proper billing of rendered patient care. Since the Defendant Hospitals began acquiring physician practices more than ten years ago Defendants' main interest in making physicians employees or contract laborers has been to ensure consistent and robust referral flows.

172.    Defendants have routinely acquired physician practices, including used equipment that Defendant Hospitals did not need, not to provide better or more efficient care but instead openly or principally in order to acquire the stream of referrals that would come with the acquisition. Achieving that goal with physicians who well-understand the gains they can personally realize in pay, perks, and benefits by leveraging the value of the referrals they can make has made Defendants all too willing to accept consistent losses on their employed

62

physicians' outpatient practices at the same time that Defendants turn a blind eye to performance and legal and ethical lapses in those employees' billing practices.

173.     This pattern of accepting losses on physician employment in return for high levels of referrals is exemplified by Park Ridge's retention of physicians to staff Southeastern Sports Medicine. Southeastern Sports Medicine (SESM) is a provider-based department of Park Ridge Health which provides orthopedic care. In 2008, Park Ridge entered into a professional services agreement with Southeastern Sports Physician Services, PLLC, which employed several orthopedic physicians, under which Southeastern Sports Physician Services' physicians agreed to work exclusively at Park Ridge's locations. In exchange, the physicians, through the PLLC, were to be paid based on the RVUs billed. Because this specialty results in significant levels of surgeries performed at the hospital (i.e., high-value referrals), in order to keep the physicians staffing SESM happy with their arrangement and referring to Park Ridge, the reimbursement per RVU is set quite high and the RVUs chargeable include not only the physician's efforts but those of non-physician practitioners.

174.     This has resulted in significant losses to Park Ridge through their engagement of Southeastern Sports Physician Services. In 2010, Park Ridge lost $2.86 million on SESM. In 2011, Park Ridge lost $2.9 million on SESM. In 2012, Park Ridge projected a loss of $2.6 million on SESM. In 2013, Park Ridge is budgeting to lose $2.6 million on SESM. But, as of September 2011, the contribution margin of the SESM physicians came to about $3.6 million (approximately $399,000/month or almost $4.8 million/year). Park Ridge accepts large losses year after year because it more than makes up for the losses through the referrals to the hospital.

175.     Defendant Hospitals thus have made no genuine attempt to lower physician compensation to fair market value for properly compensable services those physicians actually

63

supply. Further, even to the extent that Defendant Hospitals have put in place tools to curb losses, they don't utilize them if doing so is likely to reduce referrals. Thus, for instance, while many physicians at Park Ridge have provisions in their contracts that purport to require that the physicians' salaries be reduced and/or permit the hospital to reduce their salaries should their practice losses exceed a certain level, such contract provisions are never enforced in a manner that would threaten continued patient referrals from either the affected doctor or from other doctors who might be alarmed to see such enforcement of contract terms occur.

176.    For example, Park Ridge's Dr. James Bryant currently has losses of over $300,000. Despite a contract provision requiring his salary to be reduced should his practice losses exceed $189,000 in the first 18 months of his practice and another permitting Park Ridge to lower his salary by 87% of his annual losses, Park Ridge has never attempted to lower his salary to limit his losses. Now that he is leaving the hospital, Relator Church has learned in conversations with her superiors that Park Ridge has no intention of requiring him to pay any of this debt despite a contract provision that makes him responsible for all losses incurred by his practice during the last 120 days of his work at the hospital.

177.    At times, Park Ridge has also gone so far as to contractually forgive the debt acquired by its physicians. As of May 2010, Dr. John Lang had accumulated practice losses of $345,032, despite a contract provision requiring his salary to be reduced when his practice losses exceeded $125,000. In July 2010, about $138,000 of this debt was forgiven and it was agreed that he could begin receiving referral-based bonuses if his losses ceased and he paid half of his profits back to the hospital and only took the remaining half as a bonus. Because Dr. Lang remained upset with the fact that he could not take all of his net revenue as a bonus despite the losses Park Ridge had sustained in running his practice, in November 2012 Park Ridge offered to

64

forgive the remainder of his debt if he would sign a non-compete agreement, thereby ensuring that he would not work for a competitor. Park Ridge CFO Karsten Randolph and Vice President Jason Wells were willing to accept these losses because of Dr. Lang's high level of referrals.

178. Similarly, Dr. Julie Iacono, a psychiatrist who practices in Park Ridge's geriatrics practice, has a contract provision requiring her base salary of $180,000/year to be reduced to 60% of her net revenue in the case of overpayment. Despite the fact that this provision should have been in effect in 2012, she continued to be compensated at her base rate of $180,000/year. This deviation from the terms of her contract resulted in about a $40,000/year overpayment to her. When Jim Moore, Finance Manager at Park Ridge, brought this to the attention of Park Ridge's Director of Outpatient Services, Diane Sedgwick, Sedgwick indicated that they would not be putting the contract provision into effect because Dr. Iacono was a source of too much revenue for the hospital through her relationships with skilled nursing facilities and assisted living facilities.

179. Defendant Hospitals keep careful track of the value of the referrals they receive from their physician employees. An April 2011 spreadsheet tracking issues with Park Ridge's physicians notes that there is concern that Dr. Denise Ingram is not referring to Park Ridge "robustly" and will not allow the administration to view her referral records. Similarly, the same spreadsheet notes that Dr. Thomas Lugus' referrals are going to Pardee (a competing hospital in Hendersonville, NC) and he also will not allow the Park Ridge administrative staff to view his referral records.

180. Defendant Hospitals also apply undue pressure on their employee physicians to refer to their employing hospital. Park Ridge administrators have told physicians that they *will* refer to the hospital and in cases where they do not they are expected to provide the hospital with

65

an explanation. Defendant Shawnee Mission requires its physicians to fill out an "exception report" every time they refer a patient to a service outside of the hospital. The Stark Law permits compensation to a bona fide employee to be conditioned on referral to the employer, but only if exceptions are permitted if 1) the patient expresses a preference for a different provider, 2) the patient's insurer determines the provider, or 3) the referral is not in the patient's best medical interests in the physician's judgment.

## 3. Defendants' Knowledge that They are Overpaying Physicians

181. Recently, AHS corporate employees Kelly Pettijohn (AHS CFO), Karsten Randolph (Park Ridge CFO), Jason Wells (Park Ridge Vice President), Jimm Bunch (Park Ridge CEO), and Brian Stiltz (AHS Vice President) have become concerned about these excessive physician salaries and began performing annual analyses of the compensation provided to the hospitals' physicians. A 2012 analysis of all of the physicians employed by the Adventist Health System hospitals flagged more than 50 physicians as receiving more compensation than could be considered "commercially reasonable" based on MGMA reviews of physician compensation.

182. Hospital administrators are well aware that the losses suffered by the hospital are due in large part to overcompensation of physicians. In July 2012, Jim Moore, Finance Manager at Park Ridge Health, sent Karsten Randolph, Park Ridge's CFO, a list of "financial issues" at Park Ridge Health. These "issues" consisted primarily of physicians who were being paid so much that they could not bill enough to cover their expenses. For instance, Dr. James Bryant was marked as a "recurring issue" because he would need to bring in approximately $70,000/month in billings to break even and was bringing in only around $57,000. Jim Moore concluded that the "required level of revenue is unattainable under current set of circumstances."

66

Similar statements were made for several other physicians who showed consistent losses in their practices.

### 4. Extra-Contractual Perks Granted to High-Referring Physicians

183. Much of this excessive compensation is provided for in the physicians' employment contracts. However, some of the excessive compensation comes from compensation which is wholly outside of the agreed upon contract and takes a variety of forms. For instance, Dr. R. Christian Estes, an orthopedic surgeon employed by Park Ridge, had his lease payments for his BMW and Mustang covered for years by Park Ridge, despite there being no provision for such payments in his contract.

184. Dr. Timothy Highley, a dermatologist employed by Park Ridge Health, continues to run an independent private practice outside of his work at Park Ridge. Such work is unaddressed in his contract but for over 3 years Park Ridge footed the bill for the staff and equipment at his private office. Park Ridge has since ceased this practice but Dr. Highley continues to take Park Ridge supplies and drugs to stock his private practice and Park Ridge pays for medical malpractice insurance to cover his work at his private office.

185. Similarly, Dr. John Lang, a family practitioner employed by Park Ridge Health was required under his 2004 contract to take a reduced salary should his practice losses exceed $125,000. Rather than enforce this provision, the contract was amended in 2010 to forgive a substantial portion of Lang's then-existing cumulative loss of over $345,000.

186. Likewise, Dr. Mikhail Vinogradov, an oncologist employed by Park Ridge Health, was required under his 2007 contract to "devote substantially all of his/her professional time and attention to the practice of Medical Oncology/Hematology at Park Ridge Hospital."

67

However, he works only 20-24 hours/week and takes over 50 days off a year, while still taking his full base salary.

## 5.    Improper Bonus Arrangements

187.    Defendant Hospitals are losing money on their employed physicians in part based on hefty base compensation and perks as described above. But a large amount of additional compensation is also provided through various bonus structures which in and of themselves often constitute improper compensation arrangements under the Stark Law and payments to induce referrals under the Anti-Kickback Statute.

188.    One bonus structure used at Park Ridge and other Adventist Health System hospitals with provider-based practices is the providing of bonuses to physicians based not on their own personally-provided professional services but based on all of the revenue paid to the hospital in association with their work.

189.    The contracts for many employee physicians of Park Ridge Health provide that in addition to a base salary, they may receive quarterly bonuses calculated as follows: quarterly revenue (defined alternatively as the "professional charges," or simply "charges," "generated by the physician for the quarter multiplied by the historical collection percentage") minus expenses (defined as the "physician's base wages and benefits," "physician's quarterly office expenses," and "physician's calendar year losses (if any)"). Regardless of the contract language, the "revenues" on which physicians' bonuses are based include not only the professional charges associated with the physicians' services but also a significant portion of, if not all of, the facility fees payable to the hospital in association with these professional services.

190.    As described above, provider-based hospital outpatient departments, like those in which many of Defendant Hospitals' physicians work, are reimbursed by Medicare through a

68

professional fee and a facility fee. Were these same physicians to operate out of stand-alone physicians' offices, this would not be the case. Generally, in that case they would be reimbursed through a single global payment intended to cover the physician's overhead associated with running his/her own office.

191. For all CPT/HCPCS codes other than evaluation and management codes, where Defendant Hospitals' provider-based physicians are to receive bonuses based on their "[professional] charges," the Defendant Hospitals include in the "revenue" on which their physicians receive bonuses the *entire* APC/facility fee associated with the code.

192. Evaluation and management codes (i.e., CPT/HCPSPC codes 99201-99205 and 99211-99215) are treated somewhat differently. The revenue credited to the physicians' accounts based on their billing of E&M codes is equal to 115% of the fee that the physician would have gotten from Medicare had he/she been billing from a stand-alone facility.

193. For example, CPT/HCPCS code 99201 is properly billable for a relatively simple new patient office visit. Under the North Carolina 2012 Revised Medicare Part B Fee Schedule, if this service is provided in a hospital outpatient department, the reimbursable facility fee is $50.35 and the reimbursable professional fee is $24.86, for total reimbursement of $75.21. If the service is provided in an independent physician's office, the global reimbursement is $40.32. Therefore, Defendants' physicians would receive 115% of $40.32 or $46.39 credited to their account, well in excess of the professional fee attributable to the physician's services.

194. The following physicians and non-physician practitioners, employed by Park Ridge Health, are known to have been compensated in this manner: Dr. Cyril Abrams (cardiologist), Dr. Royce Bailey (cardiologist), Dr. Jennifer Blattner (ob/gyn), Dr. James Bryant (family practitioner), Dr. Donald Culver (geriatrics), Dr. Sarah Danninger (family practitioner),

69

Mr. Jeremy Davidson (physician's assistant), Ms. Teresa Davidson (physician's assistant), Dr.

Daniel Eglinton (orthopedic surgeon), Dr. Thomas Eisenhauer (surgeon), Dr. Harold Elliott

(psychiatrist), Dr. R. Christian Estes (orthopedic surgeon), Dr. Albert Ford (geriatrics), Dr.

Robert Francis (orthopedic surgeon), Ms. Vesna Francis (physician's assistant), Mr. French (a

social worker), Dr. Robert Garfield (podiatrist), Dr. Robert Godsey (psychiatrist), Dr. Wade

Grainger (family practitioner), Dr. Dale Haggman (cardiologist), Dr. Teresa Herbert

(pediatrician), Dr. Timothy Highley (dermatologist), Ms. Martha Hoffman (physician's

assistant), Dr. Allan Huffman (surgeon), Ms. Paula Hunter (physician's assistant), Dr. David

Husted (psychiatrist), Dr. Denise Ingram (family practitioner), Dr. Ronald Johnson (family

practitioner), Dr. Clifford Johnson (urologist), Ms. Sarah Johnson (physician's assistant), Dr.

Richard Jones (orthopedic surgeon), Dr. Eileen Keppler (ob/gyn), Dr. Clara Kim (internist), Dr.

Margaret Anne Kirkley (family practitioner), Dr. Andrew Krueger (urologist), Dr. Hillary

Krueger (dermatologist), Dr. John Lang (family practitioner), Dr. Philip Lartey (psychiatrist), Dr.

Michelle LeBlanc (breast surgeon), Mr. James Lee (physician assistant), Dr. Thomas Lugus

(family practitioner), Dr. Morris Maizels (pain management specialist), Dr. David Manly

(psychiatrist), Dr. Keith Maxwell (orthopedic surgeon), Dr. Donna McGee (family practitioner),

Dr. Gregory Motley (orthopedic surgeon), Ms. Teresa Musick (physician's assistant), Dr.

Michael Neuenschwander (otolaryngologist), Mr. Timothy Parrish (physician's assistant), Dr.

Gary Prechter (pulmonologist), Dr. David Price (surgeon), Dr. Meredith Richmond (family

practitioner), Dr. Charlotte Riddle (pediatrician), Dr. Rebekah Robinson (family practitioner),

Ms. Susan Shelton (nurse practitioner), Dr. William Simons (psychiatrist), Dr. Michael Stalford

(otolaryngology), Dr. Brian Stover (podiatrist), Dr. Leah Swann (family practitioner), Mr.

Jonathan Swinger (physician's assistant), Dr. James Thompson (internist), Ms. Kelly Thompson

(nurse practitioner), Dr. Justin Towle (ob/gyn), Dr. Mary Anne Uritis (pediatrician), Ms. Leigh Vainio (physician's assistant), Dr. Mikhail Vinogradov (oncologist), Mr. Edwin Waldrop (nurse practitioner), Mr. DonaldWetmore (physician's assistant), Dr. Jennifer Wilhelm (internist), and Dr. William Young (plastic surgeon).

195.     This bonus scheme has been used at other AHS hospitals. Richard Reiner, Executive Vice President of Adventist Health System and CEO of Adventist Health System's "Multi-State Division" (covering all Adventist Health System facilities outside of Florida), stated at a Board Finance Committee meeting that he was pushing the AHS hospitals using this bonus payment scheme to cease making these payments. He was concerned, as Park Ridge officials have been, that these payments too clearly constituted kickbacks and improper compensation arrangements and therefore should be replaced with a system that less clearly showed that doctors were being paid for their referrals. In addition, the form contracts utilized by Park Ridge have been used by many if not all of the other Adventist Health System hospitals.

196.     This bonus structure can lead to significant reimbursement to physicians, particularly those who perform a large number of procedures in their offices in addition to patient visits.

197.     For example, Dr. Timothy Highley, a dermatologist at Park Ridge, received bonuses in 2011 of almost \$368,000. This brought his total compensation for the year to over \$710,000 despite the fact that he works only 3 days a week. In 2011, Dr. Highley was questioning the value of being employed by Park Ridge and inquired about the benefit to him. James Moore, Park Ridge Finance Manager, responded that the annual benefit to him of being associated with Park Ridge, and therefore being able to receive bonus payments based on the larger facility fee reimbursement, amounted to about \$125,000.

71

198. Dr. Thomas Eisenhauer, a Park Ridge surgeon who works only two days a week, received a bonus in 2011 of almost $98,000, thereby more than doubling his base salary of approximately $80,000/year.

199. Dr. Allan Huffman, another Park Ridge surgeon who also works only two days a week, received a bonus in 2011 of over $63,000.

200. Dr. Michael Neuenschwander, a Park Ridge otolaryngologist, in addition to his $275,000 annual base salary, made a bonus of over $226,000 in 2011.

201. Dr. Michael Stalford, a Park Ridge otolaryngologist, in addition to his $250,000 annual base salary, made a bonus of over $490,000 in 2011. Dr. Stalford's annual compensation has consistently been so high that in 2010, Park Ridge Health amended his 2006 employment contract to raise his maximum compensation level from $556,000/year to the 90th percentile of the current MGMA Physician Salary Survey. Even this contract amendment hasn't worked. Dr. Stalford is currently in danger of exceeding this new compensation cap. As of October 24, 2011, Dr. Stalford had been paid $633,561.11 and according to James Moore's calculations this poised him to exceed his salary cap. Likewise, a compensation analysis by AHS' Physician Enterprise section showed that "further review" of his compensation was required as his compensation per collections and work RVU values were "outside desired parameters, possibly indicating overcompensation."

202. Dr. Thomas Lugus, a Park Ridge family practitioner, has an x-ray machine and the ability to do CBC tests in his office and therefore can bring in substantial amounts of facility fees to his cost center. However, his bonus payments are generally small. Between July 2011 and June 2012 he collected only $1,400 in bonus payments. But this is because he has negotiated his salary to an extraordinary $366,000 a year – more than twice the salary the

72

average family practitioner in the area would enjoy. His feeling was that his bonus payments were so large consistently that his base salary should be adjusted upwards so that he didn't have to "loan" the money to the hospital until the bonus payments were made every three months. Similar to Dr. Stalford, Dr. Lugus' compensation has also been flagged for review as excessive by AHS' Physician Enterprise section.

203.     The following Park Ridge Hospital physicians also all received bonuses of this sort totaling tens of thousands of dollars between May 2011 and April 2012: Dr. Denise Ingram ($99,130), Dr. Teresa Herbert ($110,913), Dr. Philip Lartey ($94,775), Dr. Brian Stover ($80,946), and Dr. Donald Culver ($69,161).

204.     Not only do these bonuses often result in or add to the general overcompensation of Defendant Hospitals' physicians, they create improper financial relationships with the referring physicians not subject to any Stark safe harbor. The Stark safe harbor for payments to employees applies only when the amount of the remuneration is consistent with fair market value and is not determined in a manner that takes into account the volume or value of referrals by the compensated physician. Further, employed physicians may be provided with productivity bonuses, but only based on services personally performed by the physician receiving the bonus. The facility fees associated with a physician's work are intended to cover the employing hospital's overhead. Any work done by a physician for an employee hospital results in "referrals" of those facility fees to the hospital. Therefore, payments to the employee physicians of these facility fees constitutes payment that takes into account the volume and value of the physician's referrals to the hospital and constitutes a bonus based on services not personally performed by the referring physician. These bonuses thus create an improper compensation

arrangement between each physician and his/her employing hospital not subject to any Stark safe harbor.

205. The facility fees paid to employed physicians under this model are referred to internally by the Defendant Hospitals as "Part A" payments (because this money should be going to the hospital to cover overhead). The executives at Defendant Hospitals are well aware that these payments are being made; in fact this is considered the "regular" form of accounting. In a memo sent to Karsten Randolph, Park Ridge CFO, by Jim Moore, Park Ridge Finance Manager, in July 2012, Jim noted that Dr. Meredith Richmond was showing significant losses. Jim Moore noted that the losses would not have been so bad under "regular net revenue accounting" but Dr. Richmond was part of a group that was only credited with the professional portion of Medicare's payments.

206. AHS corporate employees acting as Defendants' hospital administrators regularly discuss the issues with making these "Part A" payments to physicians. For example, at a March 13, 2012 meeting of the Park Ridge Hospital Administrative Council, attended by, among others, Jimm Bunch (CEO of Park Ridge Health as well as Adventist Health System's "Appalachia Region" hospitals: Park Ridge Hospital, Manchester Memorial Hospital, Takoma Regional Hospital, and Jellico Community Hospital) and Karsten Randolph (CFO of Park Ridge Health), Karsten said that Park Ridge Health's contracts with its psychiatrists were "too rich on Part A" and if the hospital was to hire anyone new it could not continue to offer the same compensation rates. In a follow-up meeting on July 27, 2012, between Relator Church, Karsten Randolph, and Dr. David Manly (Park Ridge Health's Chief of Staff), Karsten told Dr. Manly that the contracts with the psychiatrists had to be changed or "he would be at risk of going to jail" because it was "not commercially reasonable to pay so much Part A."

74

207. On various occasions, Karsten Randolph, CFO of Park Ridge Hospital, has told Relator Church that he is "worried about going to jail" for making "Part A" payments to physician employees. Despite knowing that these payments are improper, Karsten has said he has no intention of reporting the issue to CMS because the amount of money due to the government would be "insane."

208. An April 2012 spreadsheet tracking Park Ridge's financial and operational issues noted that the administration was aware that Dr. William Simons, a Park Ridge psychiatrist, mistrusted the administration because he believed he was not being paid "Part A." In the "action/resolution" column, the spreadsheet indicates that Jim Moore talked to him and assured him that he was "getting paid his full facility fees." In addition, he was told that he was only being charged 5% overhead as opposed to the usual 9.5%.

209. AHS executives have recognized that this compensation scheme is illegal and in some cases unsustainable. At an August 9, 2012 meeting, Brian Stiltz, Senior Vice President of Physician Enterprise at AHS, told several Park Ridge administrators that the "Part A" payments had to stop because it was a clear violation of the Stark Act. Even before this direct warning, Park Ridge executives had been particularly concerned about the practice of paying "Part A" to physicians. Despite Brian Stiltz' clear warning, Park Ridge executives have refused to cut back on compensation to established physicians despite their knowledge that the payments are excessive and illegal.

210. Because Park Ridge executives want to stop making the clearly improper "Part A" payments to physicians, but don't want to drop their physicians' total compensation, they are currently in the process of formulating a way to increase the base salaries of the employee

75

physicians in line with their historical bonuses so that they can halt these bonus payments without actually lessening their physicians' compensation.

211.    Defendant Hospitals also use a variety of other bonus structures and payment schemes to incentivize physicians to stay on as employees and keep referring their patients for inpatient and ancillary services at the Defendants' hospital facilities.

212.    For example, some physicians employed by Park Ridge are provided bonuses based on the number of patients they see. But the amount of these bonuses are set at levels so high that the physicians' total compensation far exceeds the value of the services they personally provide. For example, Dr. Mikhail Vinogradov receives a bonus of $25,000/quarter if he sees at least 900 patients, $35,000/quarter if he sees at least 1,170 patients, or $50,000/quarter if he sees at least 1,350 patients. This has resulted in significant compensation that far exceeds the value of his professional services. Between July 2011 and June 2012, Dr. Vinogradov received a salary of $402,199 and bonus payments of $70,202. Because of this excessive compensation, Park Ridge lost money on his employment. As of May 2012, Park Ridge had already lost almost $200,000 employing Dr. Vinogradov. But Park Ridge is willing to pay Dr. Vinogradov almost half a million dollars a year and lose this money because his "contribution margin" to the hospital, i.e., the value of his referrals to the hospital, is $1.9 million annually.

213.    At least one physician, Dr. Timothy Highley, receives bonuses based on the work of his support staff. Dr. Highley has two physician assistants who may bill for services provided within their scope of practice. The revenue attributable to their services counts towards his bonus revenue thereby allowing him to receive bonuses based on their work and not services he personally provided.

76

214. In addition to overcompensation and these assorted improper bonus structures, a variety of other payment mechanisms exist to compensate physicians for referring work to Defendant Hospitals. For example, employed physicians are sometimes compensated at above-market rates for being "on-call." Dr. Keith Maxwell, an orthopedic surgeon employed by Park Ridge Health, was compensated $1,000/weekday and $1,250/weekend day for each period of on-call coverage provided.

## C.     Payment of Kickbacks by Park Ridge to Induce Referrals of Medicaid Patients in Order to Qualify as a Disproportionate Share Hospital

215. In order to provide greater financial support to hospitals that provide a significant amount of care to low-income patients, the federal government makes payments to states to distribute among the hospitals under their purview which qualify as "disproportionate share hospitals." Generally speaking, a "disproportionate share hospital" is one which has a Medicaid inpatient utilization rate at least one standard deviation above the mean for all hospitals in the state and/or has a low-income utilization rate exceeding 25 percent. Disproportionate share ("DSH") payments can be substantial and therefore meeting one of these measures can be quite valuable.

216. Park Ridge has received in excess of $1 million/year as a disproportionate share hospital for several years. However, it has come close in the past to not qualifying for this additional funding. In order to protect its position as a DSH hospital, Park Ridge pays kickbacks to a family nurse practitioner who runs a provider-based practice which sees a large number of Medicaid-eligible patients. This nurse practitioner, Kelly Thompson, receives a salary for her work but also receives $200 for any of her patients that deliver at Park Ridge with another provider. Thompson delivers 15 to 18 babies a month but there are often several of her patients that she cannot deliver either because she is not at work or because there are complications and a

77

physician has to be called in. In these cases, in addition to her salary, she receives a $200 bonus simply for serving as the referral source to the hospital. An April 2011 spreadsheet indicates that the bonus was instituted because she threatened to look elsewhere for jobs and the bonus served as a "carrot" to keep her at Park Ridge for her "DSH [disproportionate share hospital] volume." In order to further increase the number of Medicaid patients Ms. Thompson is bringing to the hospital, Park Ridge now has her working approximately one day a week at the Health Department to further expand her Medicaid-eligible patient population.

## D. Payments by Park Ridge to Induce Referrals of Lab Work to the Hospital

217. For at least the last seven years, Park Ridge Health has been paying a kickback to employed and contracted physicians to induce them to send their lab work to Park Ridge's lab facilities, despite quality deficiencies those doctors perceived with that lab's work. Under the Stark and Anti-Kickback regulations, a physician employed by a hospital may generally be required to refer his patients to the hospital for treatment. However, a hospital may not require its physicians to refer to the hospital if "the patient expresses a preference for a different [provider]; the patient's insurer determines the [provider]; or the referral is not in the patient's best medical interests in the physician's judgment." 42 C.F.R. § 411.354(d)(4)(iv)(B). Further, a provider may not pay for referrals. Relators understand that Park Ridge, in order to induce its physicians to send all of their lab work to the hospital (including lab work those physicians order for Medicare and Medicaid patients), has been making payments to its physicians based on the number and value of referrals they make to the hospital of lab work for private-pay patients.

218. Several years ago, doctors had concerns that Park Ridge's lab services were substandard and began sending their patients' lab work to outside vendors. In order to

78

incentivize doctors to stop doing this, Kelly Pettijohn, currently the AHS Vice President of Physician Services and at the time the CFO of Park Ridge, instituted a "charge back" system.

219.    Physicians who are willing to send all of their lab work to the hospital for processing receive substantial kickbacks for labs performed for private-pay patients.

220.    This payment is accomplished as follows: all work for Medicare and Medicaid patients is billed through the hospital and the hospital receives payment. However, for private-pay patients the billing procedure is different. If the hospital performs the lab work and bills for it, the referring physician receives a payment equal to the "Medicare allowable" amount for that test. Therefore, the physician receives whatever amount Medicare would have reimbursed for that test and the hospital keeps any additional amount paid by the private insurer. If, the physician bills for the lab work through his/her office (though the lab work is still processed by the hospital), payment will be received by the physician's office. In order to obtain a piece of this payment, the hospital charges the physician's office 35% of what Medicare would have paid for the test, allowing the physician to keep the remainder.

221.    In addition, the hospital supplies all of the necessary lab materials to the offices including needles, vials, tubes, swabs, etc. free of charge, to be used for all patients, regardless of payer type.

222.    This results in significant compensation to some physicians and practice groups – far in excess of what would be reasonable based on the work done to collect samples. Between May 2011 and April 2012, Dr. Eileen Keppler made over $43,000 through "Internal Lab Services," while several other doctors made several thousand during the same time period: Dr. Ronald Johnson ($21,641), Dr. Denise Ingram ($10,967), Dr. Jennifer Blattner ($10,241), Dr. Thomas Lugus ($7,455), Dr. Justin Towle ($5,148), Dr. Sarah Danninger ($3,049), Dr. Rebekah

79

Robinson ($3,255), Dr. James Bryant ($2,845), Dr. Mary Anne Uritis ($2,218), Dr. Leah Swann ($5,132), Dr. Teresa Herbert ($4,390), Dr. James Thompson ($4,789), Dr. Riddle ($2,927), Mr. James Lee (PA) ($2,509), Dr. John Lang ($5,968), Dr. Donna McGee ($3,392), and Dr. Wade Grainger ($2,928).

223.    As with the "Part A" payments, Park Ridge administrators know that these kickbacks for sending lab work to the hospital are illegal. At an August 9, 2012 meeting, Bryan Stiltz, Senior Vice President of Physician Enterprise at AHS, told several Park Ridge administrators that they were not to put anything about the lab program in writing because each payment constituted a "clear kickback" and that the practice of paying the "chargeback" had to be stopped right away. After this meeting, Jason Wells, Vice President of Administration at Park Ridge, told Relator Church that the hospital was going to "quietly stop" the lab kickback program and "pray to God no one notices." Park Ridge has not yet stopped paying these kickbacks to referring practitioners.

224.    Because the hospital doesn't want to stop compensating the physicians for sending this lab work, Park Ridge administrators are currently planning on reworking physicians' contracts so that they continue to be reimbursed the same amount that they are under the current system without spelling out the reason for the compensation.

### E. Payments to Induce Referrals to Hospitals' Pharmacy Programs

225.    Kickbacks are also being paid by several Defendant Hospitals to physicians and hospital staff to induce them to refer patients to the hospitals' mail-order pharmacy programs. Defendant Hospitals Park Ridge Health, Takoma Regional Hospital, Jellico Community Hospital, and Manchester Memorial Hospital, have started selling prescriptions through a mail-

80

order pharmacy and have been paying physicians and their office staff for signing patients up to use it.

226.    Park Ridge Health runs an outpatient pharmacy called Fletcher Community Pharmacy. In 2011, Park Ridge began running a home delivery pharmacy program in partnership with a company called Equiscript (which would be responsible for recruiting patients and managing their services). Because Park Ridge Health (like the other hospitals in the region) is eligible to purchase drugs under the 340b program, it can make a significant amount of profit selling to its own patients. By Equiscript's calculations, Park Ridge and Takoma would both be able to generate profit of $50,000 within the first 90 days of the program if they could sign up 255 patients for the mail order service.

227.    Park Ridge Health has required its physicians to participate in the program. But to further induce participation, Park Ridge pays every referring physician and his/her office staff person $1 each for every prescription filled for a patient they signed up. As of July 2012, Park Ridge physicians have referred over 2,300 prescriptions to the program.

228.    Because of concerns about liability for this program under the Anti-Kickback Act and the Stark Act, Karsten Randolph, Park Ridge CFO, has asked that the practice of paying a dollar to referring practitioners be "quietly stopped." However, he does not want the Hospital's past practice of making these payments to be reported to CMS.

229.    These myriad schemes have led to excessive compensation of Defendant Hospitals' employed physicians. Defendants have submitted thousands of claims to Medicare, Medicaid, and other federal and state-funded health care programs for payment for services rendered to patients referred for services as a result of these kickbacks to and improper financial relationships with referring physicians.

81

230. The excessive compensation to Defendants' physicians, compensation provided outside the terms of the physicians' governing contracts, bonus compensation based on measures other than the personally performed services of the physicians, and payments for referrals of lab work and prescriptions to Defendant Hospitals all constitute improper financial relationships with physicians under the Stark Act and kickbacks to induce referrals under the Anti-Kickback Statute. As such, all claims submitted as a result of these referrals are false under the federal False Claims Act and the False Claims Acts of the plaintiff states.

## F. Defendants' Consistent Fraudulent Upcoding and Improper Billing Practices

231. Several Defendant Hospitals have significant coding issues which their administrations have refused to correct. These issues take various forms at the different hospitals but include: consistent upcoding, improper use of modifiers, improperly billing the services of non-physician practitioners under the provider number of physicians, billing without proper documentation, and billing for medically unnecessary services.

232. Until around 2009 Defendant Hospitals performed audits twice a year. Starting around 2009, a corporate policy went into effect requiring annual review of 15 patient encounters for each physician to ensure that physicians were billing E&M codes at an accuracy level of 80% or above. The AHS Compliance Office must approve of the audit firm selected to do these reviews and receives a formal report detailing the results.

233. Under the current policy if a physician fails to maintain an 80% accuracy rate, 10 more of the physician's encounters are reviewed every quarter. If the physician maintains an 80% accuracy rate for two quarters, quarterly review may be stopped and annual review of 15 charts resumed. However, no matter how poor a physician's compliance scores are, or how long

82

those scores persist, there is no corporate policy requiring enhanced action to be taken to ensure that false codes are not being submitted to federal and private payors.

234. At all of the Defendant Hospitals described below, hospital administration has been made aware of the continuous billing problems but has only maked an effort to correct such issues when they result in decreased reimbursement to the hospital.

### 1. System-Wide Issues

235. Several AHS-wide policies have resulted in improper billing at all Defendant Hospitals with provider-based physician practices, namely: Florida Hospital DeLand, Florida Hospital Fish Memorial, Florida Hospital Flagler, Florida Hospital Heartland Medical Center, Florida Hospital Memorial Medical Center, Florida Hospital Zephyrhills, Manchester Memorial Hospital, Park Ridge Health, and Takoma Regional Hospital.

236. All of the hospitals listed above have been improperly billing "established" patients as "new" in order to receive higher reimbursement on their facility payments, even if the patients have been seen at the hospital before. According to CMS guidance, a patient is "new" to a physician if he/she has never received professional face-to-face services from the same physician, or from another physician of the same specialty from the same physician practice, within three years of the service at issue. But a provider billing for a facility fee may only bill Medicare as if the patient is "new" to the provider, if the patient has not been registered as an inpatient or outpatient at the hospital within the previous three years. *See* 73 Fed. Reg. 68502, 68679 (Nov. 18, 2008). Instead of following this rule, at all AHS hospitals with provider-based facilities, the billing department has been billing patients as "new" to the facility as long as they were new to the rendering department.

237. According to internal audits by Park Ridge, 80% of patients billed as "new" for payment of a facility fee should have been billed as "established" under the proper coding system. This level of non-compliance is likely consistent across all of Adventist Health System's hospitals with provider-based locations.

238. In September 2012, OIG made a limited inquiry to Park Ridge and Takoma Hospital on this issue. Shortly thereafter, Park Ridge received a limited RAC audit of the same issue. But these limited inquiries will not demonstrate anything approaching the full extent of this problem at the Defendant Hospitals. Park Ridge administrators believe that they may have received close to $1 million based solely on this improper billing. Moreover, because this increased reimbursement is so significant, Relators have been told that if CMS does not continue to probe this issue at Park Ridge or Takoma beyond the small number of charts requested, the hospitals will not self-disclose the issue. The amount of money at stake is "just too much." In October 2012, after the small RAC audit request was received, Daniel Wolcott, CEO of Takoma Hospital, emailed Park Ridge CFO Karsten Randolph asking for a report on the potential cost of self-reporting this issue. Randolph immediately called him and told him never to put a question like that in writing.

239. In addition, all Defendant Hospitals with provider-based physician practices (see paragraph 236, above) engage in "mirror billing." As discussed above, CMS has issued detailed guidelines for physicians in determining what code is properly billed for their evaluation and management services, considering the history they review, the symptoms they assess, and the physical examination they perform. Physicians must abide by these coding rules. But these coding determinations do not guide the code that should be billed to account for the provider's overhead services. Rather, when a provider bills for the facility fee associated with a physician's

Case 3:12-cv-00856-FDW-DSC Document 1 Filed 01/03/13 Page 84 of 122

professional services, the code utilized must be determined based on the hospital resources utilized in providing that service, not the professional E&M components. *See* 72 Fed. Reg. 66580, 66805.

240. In determining the appropriate level for the visit, CMS has directed providers to establish internal procedures to evaluate resource utilization in such encounters and to bill codes based on such analysis. Industry experts suggest that providers consider things like whether there was administration of medication, bedside testing, insertion of a nasogastric tube, application of bandages or slings, or whether catheter care, frequent monitoring/supervision, social service intervention, or extended patient education were needed. When such evaluations are employed, the level chosen by the provider often will not - and should not - match the practitioner's level. For example, just because a physician provides a review of a new patient that would justify billing code 99205 for the professional services component of reimbursement, does not mean that the hospital has extended overhead resources sufficient to justify the hospital billing the same high-level code. Separate analysis of that issue is required. However, the Defendant Hospitals listed above act as if this were automatically the correct way to bill. The hospital simply "mirrors" on its UB form seeking payment of its facility fee whatever code the physician billed on his or her 1500 form seeking compensation for his or her professional services.

241. No AHS policy exists guiding how billing for facility fees on E&M services should be done. When relators have asked the billing department at Park Ridge about this lack of a corporate policy, they have said that it would be "too hard" to come up with a means of coding based on the facility's resource use, so they have defaulted to mirror billing.

85

### 2. Park Ridge

242. Relator Pryor has repeatedly told Park Ridge's Compliance Committee, which Park Ridge CFO Randolph heads, that billing issues abound within the hospital. Rather than taking action to address consistent upcoding issues, Park Ridge administrators such as Karsten Randolph, Dr. Wade Grainger, and Jimm Bunch, have simply told Relator Pryor that she is "too conservative with compliance" and to leave the issues alone. For instance, after Park Ridge's Medical Director, Dr. Grainger, showed on audit a coding compliance rate of 0%, rather than putting him on 100% pre-bill review, the Compliance Committee told Relator Pryor to stop auditing his records. Similarly, Relator Pryor has been told to halt auditing the records of physicians in the geriatrics practice because their compliance rates are consistently so low that the hospital does not want a "paper record" of their poor billing practices. Rather than ensuring that doctors are billing properly, such as by instituting 100% pre-bill review for doctors with problematic coding habits, or requiring the doctors with billing issues to bear the cost of hiring an auditor, Park Ridge has simply attempted to delegate to the physicians responsibility for any financial consequences that might result from known deficiencies.

243. Given the fact that the vast majority of billing deficiencies involve upcoding and lack of documentation supporting billing claims, and that Park Ridge is the entity that actually submits the improper bills for unwarranted payments, its efforts to evade responsibility for resulting overcharges is a poor substitute for its own due diligence as the billing provider.

244. Relators have on several occasions recommended that a 100% pre-bill review be instituted or that the problematic physicians be forced to bear the cost of auditing their own records, but these recommendations have been repeatedly denied by Kelly Pettijohn (AHS Senior Vice President of Physician Services), Karsten Randolph (Park Ridge CFO), and other

86

high-ranking Park Ridge and Adventist Health System officials. However, when there is evidence of undercoding, the hospital administration is quick to respond. For example, Ms. Carla Norman (PA) was coding level "2" E&M codes for all of her patients. When a review was done showing that some of these should have been coded higher and that reimbursement was thus being diminished improperly on those claims, the hospital administration immediately sent Relator Pryor to educate Ms. Norman about proper coding technique. Park Ridge has never voluntarily repaid any reimbursement received from a federal payor based on physician over-billing, even when its own auditors have determined that overcharges have occurred.

### i. Overbilling and Unnecessary Services in Geriatric Practice

245. There are approximately 14 physicians employed by Park Ridge hospital who provide care to elderly patients in over 30 skilled nursing facilities and assisted living facilities located near the hospital. These make up Park Ridge's "geriatrics practice." Most of these physicians provide medical services to the patients. A few provide psychiatry services. Park Ridge revenue resulting from these services averages over $250,000 a month (coming almost entirely from Medicare or Medicaid).

246. The practices of these physicians have been extremely problematic for years. There is no structure for when visits are due, no system to track new vs. recurring vs. chronic conditions, and no retention of notes to ensure continuity of care. As Park Ridge has long been aware, but has not adequately addressed, this results in excessive visits and poor patient care.

247. A typical patient in one of these facilities would legitimately need to see a physician 10-12 times a year at most. Park Ridge's patients often are being seen three to four times this amount. For example, in the second half of 2010 (6 months), four patients were seen more than 20 times (which translates to over 40 visits a year) and 99 patients were seen at least

87

10 times (which translates to over 20 visits a year). Medicare and Medicaid are routinely billed for these unneeded visits.

248. This excessive visitation has continued through 2011 and 2012. In 2011, one patient was seen 69 times, one patient was seen 54 times, seven patients were seen at least 40 times, 28 patients were seen at least 30 times, and 92 patients were seen at least 20 times.

249. Between January 1, 2012 and August 31, 2012 (8 months), two patients were seen more than 40 times each (which translates to over 60 visits a year), nine patients were seen more than 30 times each (which translates to over 45 visits a year), and 65 patients were seen at least 20 times each (which translates to over 30 visits a year).

250. Park Ridge geriatric patients receive approximately 40% more visits, on average, than would be considered medically necessary for an average population.

251. Park Ridge's geriatric physicians also have extremely poor documentation. Even when visits are medically necessary, documentation is often very poor or nonexistent.

252. Because the Park Ridge physicians are not communicating they end up undoing and re-doing each other's work. The doctors do not keep patient charts onsite and records left at nursing homes are often lost or unavailable when needed. As a result, it is not rare for a physician to visit a patient and adjust her medication only to have a psychiatrist visit her shortly thereafter and adjust it back. Even worse, physicians have duplicated each other's efforts and sometimes ended up over-medicating patients. This results in duplicative physician visits and poor care.

253. The geriatric physicians' coding compliance rates are consistently low. Under Adventist Health System's compliance programs, physicians are supposed to have 15 of their

88

charts audited annually to ensure they are coding appropriately. The table below shows the audit

results for several of the geriatric physicians over the last few years:

| Provider | 2007 E&M Audit | 2008 E&M Audit | 2009 E&M Audit | 2010 E&M Audit | 2011 E&M Audit | 2012 Q1 E&M Audit |
|---|---|---|---|---|---|---|
| Ms. Karen Cooper (NP) | | | | | 0% | |
| Dr. Donald Culver | 62% | 47% | 65% | 75% | 62% | 73% |
| Ms. Whitney Doiron | | | | | | 60% |
| Dr. Albert Ford | 60% | 56% | 75% | 55% | 51% | 53% |
| Ms. Martha Hoffmann (PA) | | | | | | 47% |
| Ms. Mildred Hyman (NP) | 60% | 70% | 95% | 95% | 87% | 53% |
| Dr. Julie Iacono | | | | | | 7% |
| Dr. Margaret Anne Kirkley | | | | | 59% | 53% |
| Dr. Clive Possinger | 71% | 38% | 70% | 75% | 66% | 67% |
| Dr. Benjamin Pusser | | | | | | 13% |
| Ms. Christine Urbaniak (PA) | | | | | | 0% |
| Mr. Edwin Waldrop (NP) | | | | | 52% | |

254.    Despite these poor showings, none of these professionals have been put on 100%

pre-billing review.

255. Park Ridge officials are aware of these consistently poor scores by the geriatrics physicians. Recently, Park Ridge CFO Randolph, directed Relator Pryor to stop auditing the physicians in the geriatrics practice because he did not want a record of their poor compliance rates.

256. Occasionally, even CMS has been concerned by Park Ridge's geriatric physicians' use of particular codes. In 2009, Dr. Donald Culver was subject to a probe review by CMS in connection with his use of code 99309. Of 20 claims reviewed by CMS, one was denied entirely and 19 were down coded, resulting in an overpayment of over $500 (almost half of the entire reimbursement for the services audited). In November 2010, another post-payment review of his 99309 services was conducted and found a 70% compliance rate and an overpayment of $90.53. Despite these findings, no pre-payment reviews of Dr. Culver's claims have been required, and no effort made to recover for overpayments on claims that were not subject to audit. Nor have these poor audit results caused Dr. Culver to alter his improper billing practices. To this day, Dr. Culver's Office Coordinator says that Dr. Culver sometimes asks her to post his charges before he has even seen the patients in question because he "knows ahead of time who he is going to see each week and what he is going to charge."

257. A consistent source of upcoding in the geriatrics practice is the use of "facility" codes by psychiatrists rather than use of "medication management" codes, as would be proper. The psychiatrists visiting geriatric patients in skilled nursing facilities and nursing homes properly bill code 90801 on their initial interview with a patient to indicate that they have completed a diagnostic interview. However, when they return to provide follow-up services, rather than billing 90862 to designate that they are providing follow-up medication management services, they use codes 99304-99310 or 99324-99328/99334-99337 as if they had provided

90

evaluation and management services to these patients in nursing facilities or other custodial care settings. Review of their documentation plainly shows that the services provided in these follow-up visits are for medication management and not the more in-depth evaluation services. The doctors have been told repeatedly that this is improper upcoding but have said they continued to do it because it would be "impossible to make a living" billing properly.

258.     In particular, Dr. Julie Iacono and Ms. Christine Urbaniak (PA) have abused these codes in order to increase their reimbursement. Between January 2012 and April 2012, Dr. Iacono billed 879 times for improper codes, billing for initial or subsequent care in nursing facilities or rest homes when she should have been billing for medication management services. Ms. Urbaniak did the same thing 363 times in the same period.

259.     Recently, due to Relators' efforts, the psychiatrists in the geriatric practice have begun billing properly for their medication management services. But for over a year, this improper billing went unchecked. Karsten Randolph, Park Ridge's CFO, is aware that this problem went on for over a year. In fact, a letter from him was the only reason it has halted. But he has decided that Park Ridge will not report this issue to CMS, and will not refund the overpayments he knows the hospital received during that time.

260.     Another billing issue common to Park Ridge's geriatric providers is the improper billing of services to patients in nursing facilities. Under CMS rules, when a patient is seen in a skilled nursing facility, only the physician can provide the "initial" visit. 42 C.F.R. § 483.40(c)(4). Therefore, even if a non-physician practitioner needs to see the patient before the doctor is available, this visit is billed as "subsequent" care and the physician's later visit is considered the "initial" visit.

91

261. The rules are different for assisted living facilities. If permitted under state law, a non-physician practitioner may provide the "initial" visit to patients in assisted living facilities.

262. Because North Carolina permits such, for visits to patients in nursing facilities, no matter who provides the first visit to a patient to initiate care, whether physician or non-physician practitioner, that visit must be billed as the "initial" visit.

263. Park Ridge's geriatric physicians were improperly using the rules applicable to skilled nursing facilities to bill for services provided in assisted living facilities. This resulted in increased reimbursement that has never been paid back.

264. In March 2011, in connection with his private practice, Dr. Albert Ford was forced to repay $862.60 to CMS after a RAC audit showed that he had improperly billed for "initial" visits to patients in rest homes that should have been billed as "subsequent" care, because he was using the rules applicable to nursing facilities. At that time, he disclosed to Relator Pryor and others that all of the Park Ridge geriatric physicians had been billing this way.

265. The low coding compliance rates of the geriatric physicians have persisted for years, as seen in the table above. This is despite the fact that when charts have been identified for auditing it is not uncommon for physicians to document their visits only for the charts they know are to be reviewed.

266. The physicians in the geriatric practice, like the majority of Park Ridge's employed physicians, are also overcompensated. In June 2012, despite bringing in revenue of over $279,000, the practice group overall lost money because of excessive compensation. A February 2012 report notes that the department has been losing about $30,000 a month and the variance from the budget is due mainly to physician salaries and bonuses.

92

267. Karsten Randolph, Park Ridge's CFO, is well aware of the consistent excessive visits and overcoding. He has tasked Relator Church with "fixing" the program. Given the magnitude and multitude of problems in the practice, this has come to mean that Park Ridge will be shutting down its geriatrics practice. Nevertheless, Karsten has refused to report the issues to CMS because "it would be too much money" to repay the overcharges that occurred.

268. On September 25, 2012, relator Melissa Church made a formal presentation to Jimm Bunch (CEO of Park Ridge Hospital as well as Adventist Health System's "Appalachia Region" hospitals), Karsten Randolph (Park Ridge CFO), and Jason Wells (Vice President of Administration at Park Ridge) and fully explained the numerous issues plaguing Park Ridge's geriatric practice. She told them in no uncertain terms that the program had suffered significant financial losses over the previous two years, that physicians were being compensated at levels above what their contracts allowed for, and that physicians were visiting patients excessively, coding visits improperly, and failing to document their visits properly.

269. Park Ridge officials, including Jimm Bunch and Karsten Randolph, have decided to shut down the geriatrics practice because 1) they recognize that the liabilities mounting because of its myriad problems would result in major financial issues for the hospital if the program were audited and, 2) the program has not resulted in enough hospital referrals to make up the losses incurred because of the overcompensation of the participating physicians. Those officials, however, have declined to take any steps to repay Medicare or Medicaid for any overcharges that have occurred.

## ii. Improper Use of the Q6 Modifier

270. The Q6 modifier may be used to bill for the services of a substitute physician when the regular physician (whose provider number the services are billed under) is temporarily

93

unavailable for a reason such as vacation or illness. Park Ridge has not had legitimate agreements under which it could bill with the Q6 modifier for the services of a substitute physician in at least 10 years.

271. Nevertheless, Park Ridge Health has billed Medicare for hundreds of thousands of dollars' worth of reimbursement using the Q6 modifier since 2002. All of these charges were improper. Park Ridge uses the modifier not to bill for the services of substitute physicians with agreements to provide stand-in services, rather it is used to bill under the provider number of established Park Ridge physicians for the services of physicians who are employees of Park Ridge but have not been properly credentialed to bill to Medicare or other payers.

272. Relators were told that the practice of charging for the services of non-credentialed physicians using the Q6 modifier at Park Ridge had largely stopped. This is untrue. Between May 27, 2012 and November 27, 2012, Park Ridge billed for more than $30,000 worth of services using the Q6 modifier.

273. Hospital executives are well aware of the practice. Kelly Pettijohn, AHS Vice President of Physician Services, wrote an email in March 2011 to Kent Williams, Director of Park Ridge Billing, and others, saying that Dr. Leah Swann had mentioned to him that she and Dr. Sarah Danninger were billing under Dr. Wade Grainger's provider number through the Q6 modifier. Kelly went on to ask whether it would be possible to have Dr. Swann and Dr. Danninger fully credentialed within 30 days because they were planning on relocating to new offices. Kent Williams responded that it would likely not be possible to meet this timeline and Q6 was the "only way" the hospital could get paid while waiting for credentialing.

94

274. A March 2012 report on Park Ridge's financial and operational issues indicates that there was an issue with the use of the Q6 modifier for the work of the hospitalists but that it was being documented and discussed "off-line."

275. The fact that modifier Q6 was being used to bill for non-credentialed physicians was noted in a Park Ridge financial management meeting, but CFO Karsten Randolph asked Relator Church to delete the notes. When she asked, "What if we're audited?" he simply laughed in response.

276. Finally, an outside auditor brought the improper use of the Q6 modifier to the attention of the hospital's Compliance Department but was told to drop the subject and stop looking into the issue.

### iii. Improper Use of Modifier 25

277. As described above, in most cases, when a physician performs a procedure, the pre- and post-operative care that is necessary to properly perform the work is reimbursed by Medicare through the payment made for the procedure itself. However, in those instances where evaluation and management services are necessary due to a different presenting issue, the physician may bill for a separate E&M code. In order to signal to Medicare that the E&M code is to be reimbursed in addition to the procedure code, the E&M code is submitted with modifier 25.

278. Park Ridge physicians routinely abuse modifier 25, adding it to procedures where there is no significant and separately identifiable evaluation and management service. On June 15, 2011, at a meeting of the physicians' Office Coordinators, Kelli King, a Park Ridge billing compliance officer, reported that a recent compliance audit showed that there was "definitely a problem with modifiers not being correct." Again, at the July 20, 2011 meeting of the

physicians' Office Coordinators, it was pointed out that "[t]here is a big problem with modifier 25 if there is any kind of therapeutic injection with the office visit."

279.    A 2011 review of 10 charts which used modifier 25 showed that it was used properly only 40% of the time.

280.    Park Ridge's dermatology practice is particularly abusive of the code and Dr. Timothy Highley may be the worst offender in the group. When Park Ridge conducted its annual audit of Dr. Highley's charts, he had correctly coded only four of the 10 charts, and five of his errors were for inappropriately using modifier 25 to improperly obtain reimbursement for a separate E&M service when none was performed.

281.    In those cases where a physician has not indicated that modifier 25 be used, the billing office, upon review, may "task" the physician's Office Coordinator with "investigating" and adding the modifier if the chart supports it. Relators are aware that the billing office has frequently added modifiers that were not warranted, such as when the Q6 modifier is used to obtain reimbursement for non-credentialed physicians. Relators believe that the billing office may also be adding modifier 25 to charges in order to obtain greater reimbursement than is due.

### iv.    Improper Use of Modifier 59

282.    Modifier 59 is intended to be used to signify that a physician has provided separate procedures or services that would not normally be performed by the same physician on the same day. For example, modifier 59 may be appropriate to indicate that separate surgeries were performed or distinct organ systems treated.

283.    Park Ridge physicians routinely use modifier 59 to bypass Medicare's bundling provisions and obtain reimbursement for services that are properly reimbursed together. Park Ridge CFO, Karsten Randolph, reported to the Park Ridge Board of Directors in April 2012 that

a review of 10 records showed that 6 lacked appropriate documentation to support use of the 59 modifier. Because of this low compliance rate, second and third reviews were conducted which showed only minor improvement.

284.    Two other audits conducted in 2012 to test use of modifier -59 showed compliance rates as low as 25%.

<b>v.    Other Kinds of E&M Upcoding</b>

285.    Physicians at Park Ridge consistently upcode services and procedures to obtain higher reimbursement. For many of the physicians, this works to their financial advantage because they receive bonuses based on the revenue attributable to their cost centers – including all professional and facility fees billed for their services. Therefore, the more revenue they can bring in, the higher their bonuses may be.

286.    Park Ridge audits 15 encounters for each physician every year. For those physicians who do not show at least an 80% accuracy rate, there is an additional audit of 10 charts every quarter. There are, however, no additional consequences to force physicians to change their practices. Despite the fact that many physicians show compliance levels significantly below 80% on audit after audit, no physician has been put on pre-bill review or otherwise disciplined. (Only the few claims that are actually audited are corrected; no effort is made to review unaudited claims even when audit results show serious over-billing in the test samples.) In 2007, 13 of the 25 physicians included in the E&M audit (52%) had compliance scores below 80%. In 2008, 25 of the 40 physicians included in the E&M audit (62.5%) had compliance scores below 80%. In 2009, 21 of the 44 physicians included in the E&M audit (48%) had compliance scores below 80%. In 2010, 20 of the 47 physicians included in the E&M audit (42.6%) had compliance scores below 80%. In 2011, 26 of the 72 physicians included in

the E&M audit (36%) had compliance scores below 80%. The table below shows the deplorable audit accuracy rates for several of Park Ridge's physicians:

| Doctor | 2007 E&M Audit Results | 2008 E&M Audit Results | 2009 E&M Audit Results | 2010 E&M Audit Results | 2011 E&M Audit Results | Q1 2012 E&M Audit Results |
|---|---|---|---|---|---|---|
| Dr. Bailey | 60% | 46% | 60% | 60% | 60% | 60% |
| Dr. Culver | 62% | 47% | 65% | 75% | 62% | 73% |
| Mr. J. Davidson (PA) | | | 75% | 70% | 68% | 20% |
| Ms. T. Davidson (PA) | | | 65% | 55% | 72% | 53% |
| Dr. Eisenhauer | 80% | 31% | 80% | 70% | 74% | 60% |
| Dr. Estes | 80% | 60% | 50% | 70% | 60% | 73% |
| Dr. Ford | 60% | 56% | 75% | 55% | 51% | 53% |
| Dr. R. Francis | 50% | 46% | 60% | 65% | 87% | |
| Dr. Grainger | 62% | 63% | 85% | 80% | 90% | 0% |
| Dr. Highley | 89% | 80% | 65% | 75% | 67% | 60% |
| Dr. Lugus | 38% | 31% | 65% | 65% | 71% | 87% |
| Dr. Motley | | 25% | 45% | 65% | 70% | 53% |
| Dr. Possinger | 71% | 38% | 70% | 75% | 66% | 67% |
| Ms. Shelton (NP) | 80% | 54% | 60% | 60% | 64% | 40% |
| Dr. Thompson | 50% | 38% | 75% | 55% | 62% | 80% |
| Dr. Young | 80% | 25% | 42% | 30% | 57% | 33% |

287.    Improper coding overwhelmingly skews to favor higher reimbursement to the doctors. For all of the charts audited in the first quarter of 2012 (a total of 540 encounters), 176

were improperly coded. Of these 176 improperly coded charts, only four errors were due to undercoding. 98% of the errors would have resulted in increased reimbursement.

288.   Park Ridge doctors with consistently low coding compliance rates regularly inflate the level of service they provide by claiming to have provided more intensive services than were medically necessary, provided, and/or documented. Complicating this pattern of overcoding is the fact that over the last two years as Park Ridge has instituted an electronic medical records system (known as NextGen). Many of these same doctors now use the software as an excuse to continue their upcoding. NextGen will "suggest" a coding level based on the "boxes" that a physician checks indicating what sort of history he has taken or what bodily systems he has assessed. In their attempt to continue coding their patients at very high levels, many of Park Ridge's doctors "check off" more boxes than necessary or for more tasks than they have in fact completed (in the process often failing to document any assessment actually made), in order to reach an elevated service level. When confronted with their overcoding, many doctors seek to use NextGen as a defense, despite having been told repeatedly that the system can only suggest a coding level and only based on what the doctor has told it he/she has done. The system's suggestion cannot stand in for proper documentation and medical treatment in line with what is necessary for each patient's needs.

289.   In addition to certain doctors who show particularly poor coding accuracy, Park Ridge has failed to control certain hospital-wide billing problems. For years, Park Ridge would bill for a patient's outpatient visit to a physician even though the patient was seen at the hospital for the same issue on the same day. In order to bypass Medicare's coding edits that would disallow such duplicative claims, the Hospital used a modifier to make it appear that the visits were unrelated. In this manner, Park Ridge thus was able to get paid for two bills instead of one.

99

290. The hospital has recently instituted policies to halt this practice. However, because it will have an effect on physician revenue that its employee physicians resent (since they will no longer receive the full payment for the office visit), hospital staff are manually crediting to each physician who sees a patient on the same day that they go to the hospital for a related service, the "Part A" payment attributable to the hospital service.

291. Hospital evaluation and management code 99233 is also known to be regularly abused at Park Ridge. An audit conducted of 99233 charges (which code is properly used only for relatively substantial follow-up hospital evaluation and management services) between January 1, 2012 and April 30, 2012 showed an error rate of 61% (of 110 records audited, only 43 were coded correctly). Between January 1, 2012 and September 30, 2012, code 99233 had been used 4,723 times by Park Ridge physicians. This leads to significant increased reimbursement for the hospital, as Medicare will pay over $96 for an E&M service coded at a level 99233 whereas it will pay only $36.83 for an E&M service coded at level 99231.

292. On April 18, 2012, Karsten Randolph reported to the Park Ridge Board of Directors that the hospital showed only "partial compliance" with the requirement that physicians who file code 99233 provide sufficient documentation to support the code. At the meeting, Karsten reported that the review of claims billed under this code should have been performed twice during the year, rather than once, and further, falsely reported that the audit that was done showed a compliance rate of 80%. In fact, the audit referenced showed that code 99233 was properly coded only 39% of the time.

293. Relator Pryor has consistently impressed upon Park Ridge administrators the various issues with the physicians' billing practices, including repeated warnings that physicians were abusing code 99233. In September 2012, Park Ridge received a RAC audit for a few dates

100

of service for one patient seen by Dr. Philip Lartey while in the hospital. The records request was sent to Kent Williams, Director of Park Ridge Billing, with the note that, "This is the code Gloria stated they would be looking at. We may see more of this." In a screen shot with the requested dates of service listed, Mr. Williams could only respond, "Not good. Let's hope the documentation is better."

294. In October 2012, Kent Williams ran a report showing the codes billed by Dr. Royce Bailey, a cardiologist at Park Ridge, between November 11, 2011 and October 8, 2012, to find that of all of the inpatient codes he billed during that time, a full 91% were for code 99233.

295. Code 99211 is also often used inappropriately by Park Ridge physicians. That billing code is intended to be used to reimburse for outpatient visits by an established patient where evaluation and management services are necessary but the presenting problems are minimal and the participation of a physician is not required. Park Ridge physicians regularly bill for this code even though these requirements are not met. Many Park Ridge physicians bill for 99211 services even when no separate evaluation and management services were rendered by a physician or other non-physician practitioner licensed to provide such services. In 2011, code 99211 was billed 2,903 times. 64 of these records were audited and it was found that the code had been used appropriately less than 5% of the time.

296. Hospital executives are aware that there is consistent upcoding in the physician practices. Not only do they receive reports on the annual and quarterly audits showing the consistently low compliance rates seen above, there are also other indications that they are aware of issues with particular doctors. In April 2009, the results of a Medicare Audit were presented at the Physicians Quarterly Meeting which showed that of 20 claims reviewed, every single one was downcoded by the Medicare audit team. And as recently as March 2012, a report on Park

101

Ridge's financial and operation issues, presented to the Operations Committee indicates that it is well known that Dr. Meredith Richmond is billing all of her patients at a level "4" and that this poses a risk of overcoding. The same was noted for Dr. Bailey, with the warning "[s]ome must have been overcoded."

### vi. Billing without Supporting Documentation

297. Park Ridge doctors are allowed and even encouraged to bill for encounters in which there is no documentation, including for encounters with Medicare and Medicaid patients.

298. In February 2012, Adventist Health System started "grading" its subsidiary hospitals on how quickly they posted charges after services were rendered: the higher the percentage of charges that were not posted within 48 hours of service, the lower the score. Park Ridge had never required doctors to complete documentation of services before charges were entered but once this "grading" began, Park Ridge administrators put in place a firm rule that charges had to be posted within 48 hours of service whether or not documentation had been completed, thereby virtually ensuring that many charges would be posted before documentation was complete.

299. Starting around the beginning of 2012, Park Ridge began running a monthly report to determine how many bills lacked documentation in the records. The monthly report has consistently shown 3,000 to 5,000 bills lacking proper documentation.

300. A March 2012 audit of Dr. Wade Grainger, Park Ridge's Medical Director, could not be completed because only 8 of the 15 charts which had been pulled for review had any documentation at all. This behavior has not changed. As of August 2012, Dr. Grainger had 264 dates of service (dating back to October 2011) for which he lacked any documentation and which had all been billed for. The Park Ridge administration has gotten progressively more concerned

102

about this, not because they care about the impropriety of billing without supporting documentation, but because the hospital was upgrading its billing system that, once implemented, would make it impossible for the records for these undocumented but already billed services to be altered. In September 2012, the administration required Dr. Grainger to devote a full day simply to catching up on his prior bills which lacked documentation. But, even after that, he still had 270 charts lacking appropriate documentation to support the billed charges. Jason Wells, Vice President of Administration, asked Dr. Grainger to take several additional days to continue backfilling his documentation, so as to avoid "creating a compliance nightmare bigger than we already have." Dr. Grainger should have been put on 100% pre-bill review due to his continued lack of documentation, but this has never been done.

301. As of March 2012, there were 7,000 incomplete charts in Park Ridge's electronic health records, many of which represented billed charges.

302. As of August 2012, 3,480 patient encounters had been billed for hospital-wide which lacked any supporting documentation. Approximately 65% of these charges were for Medicare or Medicaid patients.

303. Park Ridge Vice-President Jason Wells is aware of this continuing issue. He has been involved with the hospital's effort to obtain documentation for those charts missing it as of August 2012. However, at no time has he or any other hospital administrator ensured that federal payors were not billed for encounters which lacked documentation. Nor has the hospital taken any steps to ensure that late-added documentation created to support previous billings is reliable and not simply invented to correspond with billing codes that were previously submitted and paid at unwarranted rates.

### 3. Florida Hospital Zephyrhills

103

304. Based on information from knowledgeable non-parties and internal audits and reviews made known to Relators, Florida Hospital Zephyrhills has and continues to bill federal healthcare programs despite consistent and severe billing errors. Reviews conducted between 2009 and 2011 demonstrate consistent errors in the following areas: 1) improper use of the Q6 modifier to bill for the services of non-credentialed physicians, 2) failure to document services sufficiently to justify billing (particularly by hospitalists), 3) improperly billing for the services of a non-physician practitioner under a physician's provider number (particularly by non-physician practitioners supporting hospitalists), 4) improper use of modifier 25 and upcoding by the physicians in the orthopedic group, 5) improper use of modifier 25 and provision of medically unnecessary visits by at least one physician in the podiatry practice, and 6) improper use of modifiers by physicians in the surgery group. Despite repeated presentations to hospital officials regarding these issues and education to providers these issues are believed to have continued.

### 4. Florida Hospital Flagler

305. Based on information from knowledgeable non-parties and internal audits and reviews made known to Relators, the physicians at Florida Hospital Flagler have, and continue to, improperly bill patients as new to their practices even when the patients have been seen previously by a member of the same specialty group while inpatient at Flagler Hospital. This improper billing has been going on since 2011 and is believed to be ongoing. Despite education regarding the illegality of this practice, Relators allege on information and belief that the practice is ongoing and no overpayments have been refunded.

### 5. Florida Hospital Heartland Medical Center

104

306. Based on information from knowledgeable non-parties and internal audits and reviews made known to Relators, Florida Hospital Heartland Medical Center has and continues to bill federal healthcare programs despite consistent and severe billing errors. Reviews conducted between 2008 and 2010 demonstrate consistent errors in the following areas: 1) improper use of modifier 25, 2) improper use of the Q6 modifier to bill for the services of non-credentialed physicians, 3) billing for unnecessary services in the geriatrics practice due to excessive visits and 4) upcoding of services provided by the physicians in the geriatrics practice. Despite reports to hospital officials regarding these issues and education to providers, these issues have continued and no corrective action is believed to have been taken.

### 6. Florida Hospital Memorial Medical Center

307. Based on information from knowledgeable non-parties and internal audits and reviews made known to Relators, Florida Hospital – Oceanside, an auxiliary campus of Florida Hospital Memorial Medical Center, has and continues to bill federal healthcare programs despite consistent and severe billing errors. Reviews conducted in 2011 demonstrate consistent errors in the following areas: 1) improperly billing for more expensive services than were rendered and/or medically necessary and 2) improper use of modifier 25. Despite reports to hospital officials regarding these issues and education to providers, Relators believe these issues have continued.

### 7. Florida Hospital Tampa

308. Based on information from knowledgeable non-parties and internal audits and reviews made known to Relators, Florida Hospital Tampa has and continues to bill federal healthcare programs despite consistent and severe billing errors. Reviews conducted in 2011 and 2012 demonstrate consistent upcoding of evaluation and management services. Despite reports

105

to hospital officials regarding these issues and education to providers, Relators believe these
issues have continued.

### 8. Gordon Hospital

309. Based on information from knowledgeable non-parties and internal audits and
reviews made known to Relators, Gordon Hospital has and continues to bill federal healthcare
programs despite consistent and severe billing errors. Reviews conducted between 2009 and
2012 demonstrate consistent errors in the following areas: 1) improperly billing for more
expensive services than were rendered and/or medically necessary, and 2) improperly billing for
the services of a non-physician practitioner under a physician's provider number. This form of
billing (referred to as "incident to") is never permitted in hospital settings. Many physicians at
Gordon Hospital, particularly the hospitalists, have their nurse practitioners provide services and
then simply sign off on the nurse's notes and bill as if they had provided the services. Gordon
Hospital physicians and administration officials have been told repeatedly that this is not allowed
but they have persisted in doing it because of the additional reimbursement received by the
hospital.

### 9. Takoma Regional Hospital

310. Based on information from knowledgeable non-parties and internal audits and
reviews made known to Relators, Takoma Regional Hospital has and continues to bill federal
healthcare programs despite consistent and severe billing errors. Reviews conducted from 2005
until the present demonstrate consistent errors in the following areas: 1) improperly billing for
more expensive services than were rendered and/or medically necessary, 2) improper use of the
Q6 modifier to bill for the services of non-credentialed physicians, 3) improper use of modifier

25, and 4) improperly billing for the services of a non-physician practitioner under a physician's provider number.

## 10. Central Texas Medical Center

311. Based on information from knowledgeable non-parties and internal audits and reviews made known to Relators, Central Texas Medical Center has and continues to bill federal healthcare programs despite consistent and severe billing errors. Reviews conducted in 2009, 2010, and 2012 demonstrate consistent misuse of modifier 25 to receive reimbursement for evaluation and management services when none is due. Another issue among the Central Texas physicians is the misuse of CPT codes in order to obtain Medicare reimbursement for services that Medicare would not normally cover. In one such case, Dr. Cairus Alcides was billing for multiple hernia repair procedures to cover what appeared to be a tummy tuck, a procedure not normally covered by Medicare.

## Count I

### False Claims Act
### 31 U.S.C. § 3729(a)(1) & (3) (1986)
### 31 U.S.C. § 3729(a)(1)(A) & (C) (2009)

312. Relators reallege and incorporate by reference the allegations contained in paragraphs 1-311 above as though fully set forth herein.

313. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq. as amended.

314. With respect to acts occurring prior to the effective date of the 2009 False Claims Act amendments, by and through the acts described above, Defendants have knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval. Defendants Adventist Health System-Sunbelt, Inc., Takoma Regional

107

Hospital, Inc., and Wellmont Health System also conspired to do the same with respect to misconduct alleged herein that occurred at Takoma.

315. With respect to acts occurring on or after the effective date of the 2009 False Claims Act amendments, by and through the acts described above, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval. Defendants Adventist Health System-Sunbelt, Inc., Takoma Regional Hospital, Inc., and Wellmont Health System also conspired to do the same with respect to misconduct alleged herein that occurred at Takoma.

316. The Government, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

317. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

318. Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## Count II

### False Claims Act
### 31 U.S.C. § 3729(a)(2)-(3) (1986)
### 31 U.S.C. § 3729(a)(1)(B)-(C) (2009)

319. Relators reallege and incorporates by reference the allegations contained in paragraphs 1-311 above as though fully set forth herein.

320. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq. as amended.

321. With respect to acts occurring prior to the effective date of the 2009 False Claims Act amendments, by and through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government. Defendants Adventist Health System-Sunbelt, Inc., Takoma Regional Hospital, Inc., and Wellmont Health System also conspired to the the same with respect to misconduct alleged herein that occurred at Takoma.

322. With respect to acts occurring on or after the effective date of the 2009 False Claims Act amendments, by and through the acts described above, Defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims. Defendants Adventist Health System-Sunbelt, Inc., Takoma Regional Hospital, Inc., and Wellmont Health System also conspired to the same with respect to misconduct alleged herein that occurred at Takoma.

323. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, has paid and continues to pay claims that would not be paid but for defendants' illegal conduct.

324. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

325. Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## Count III

**False Claims Act**
**31 U.S.C. § 3729(a)(1)(G) (2009)**

326. Relators reallege and incorporate by reference the allegations contained in paragraphs 1-311 above as though fully set forth herein.

327. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq. as amended.

328. By and through the acts described above, Defendants have knowingly concealed and improperly avoided an obligation to pay money to the Government, including specifically Defendants' obligation to report and repay past overpayments of Medicare and Medicaid claims for which Defendants knew refunds were properly due and owing to the United States Government. Defendants Adventist Health System-Sunbelt, Inc., Takoma Regional Hospital, Inc., and Wellmont Health System, also conspired to do the same with respect to misconduct alleged herein that occurred at Takoma.

329. The Government, unaware of the concealment by the Defendants, has not made demand for or collected the years of overpayments due from the Defendants.

330. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

331. Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## Count IV

### Florida False Claims Act
### Fla. Stat. § 68.082(2)(a)-(b)

332. Relators reallege and incorporate by reference the allegations contained in paragraphs 1-331 above as though fully set forth herein.

110

333. This is a claim for treble damages and penalties under the Florida False Claims Act, Fla. Stat. § 68.082(2)(a)-(b).

334. By and through the acts described above, Defendants Adventist Health System-Sunbelt, Inc., University Community Hospital, Inc., Memorial Hospital-West Volusia, Inc., Southwest Volusia Healthcare Corporation, Memorial Hospital Flagler, Inc., Memorial Health Systems, Inc., Tarpon Springs Hospital Foundation, Inc., Florida Hospital Waterman, Inc., and Florida Hospital Zephyrhills, Inc. knowingly presented or caused to be presented, false or fraudulent claims to the State of Florida in order to obtain Government reimbursement to which defendants were not entitled for health care services provided under Medicaid and other state-funded health care programs.

335. In addition, by and through the acts described above, Defendants Adventist Health System-Sunbelt, Inc., University Community Hospital, Inc., Memorial Hospital-West Volusia, Inc., Southwest Volusia Healthcare Corporation, Memorial Hospital Flagler, Inc., Memorial Health Systems, Inc., Tarpon Springs Hospital Foundation, Inc., Florida Hospital Waterman, Inc., and Florida Hospital Zephyrhills, Inc. knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

336. The State of Florida, unaware of the falsity of all such claims made or caused to be made by Defendants Adventist Health System-Sunbelt, Inc., University Community Hospital, Inc., Memorial Hospital-West Volusia, Inc., Southwest Volusia Healthcare Corporation, Memorial Hospital Flagler, Inc., Memorial Health Systems, Inc., Tarpon Springs Hospital Foundation, Inc., Florida Hospital Waterman, Inc., and Florida Hospital Zephyrhills, Inc. has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

111

337.    By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

338.    Additionally, the State of Florida is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## Count V

### Georgia Medicaid False Claims Act
### Ga. Code Ann. § 49-4-168.1(a)(1)-(2), (7)

339.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1-311 above as though fully set forth herein.

340.    This is a claim for treble damages and penalties under the Georgia Medicaid False Claims Act, Ga. Code Ann. § 49-4-168.1(a)(1)-(2), and (7).

341.    By and through the acts described above, Defendants Adventist Health System-Sunbelt, Inc., Adventist Health System Georgia, Inc. and Emory-Adventist, Inc. have knowingly presented or caused to be presented, false or fraudulent claims to the State of Georgia in order to obtain Government reimbursement to which Defendants were not entitled for health care services provided under Medicaid and other state-funded health care programs.

342.    By and through the acts described above, Defendants Adventist Health System-Sunbelt, Inc., Adventist Health System Georgia, Inc. and Emory-Adventist, Inc. knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

343.    The State of Georgia, unaware of the falsity of all such claims made or caused to be made by Defendants Adventist Health System-Sunbelt, Inc., Adventist Health System

112

Georgia, Inc. and Emory-Adventist, Inc., has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

344.    In addition, by and through the acts described above, Defendants have knowingly concealed and improperly avoided an obligation to pay money to the Government, including specifically Defendants' obligation to report and repay past overpayments of Medicaid claims for which Defendants knew refunds were properly due and owing to the State of Georgia.

345.    The Government, unaware of the concealment by the defendants, has not made demand for or collected the years of overpayments due from the defendants.

346.    By reason of defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

347.    Additionally, the State of Georgia is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## Count VI

### Illinois False Claims Act
### 740 Ill. Comp. Stat. 175/3(1)(A)-(B), (G)

348.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1-311 above as though fully set forth herein.

349.    This is a claim for treble damages and penalties under the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/3(1)(A)-(B) and (G).

350.    By and through the acts described above, Defendants Adventist Health System-Sunbelt, Inc. and Adventist Health Partners, Inc. have knowingly presented or caused to be presented, false or fraudulent claims to the State of Illinois in order to obtain Government

113

reimbursement to which Defendants were not entitled for health care services provided under Medicaid and other state-funded health care programs.

351. By and through the acts described above, Defendants Adventist Health System-Sunbelt, Inc. and Adventist Health Partners, Inc. knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

352. The State of Illinois, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

353. In addition, by and through the acts described above, Defendants have knowingly concealed and improperly avoided an obligation to pay money to the Government, including specifically Defendants' obligation to report and repay past overpayments of Medicaid claims for which Defendants knew refunds were properly due and owing to the State of Illinois.

354. The Government, unaware of the concealment by the Defendants, has not made demand for or collected the years of overpayments due from the Defendants.

355. By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

356. Additionally, the State of Illinois is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## Count VII

### North Carolina False Claims Act
### N.C. Gen. Stat. § 1-607(a)(1)-(2), (7)

357. Relators reallege and incorporate by reference the allegations contained in paragraphs 1-311 above as though fully set forth herein.

114

358. This is a claim for treble damages and penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-607(a)(1)-(2), and (7).

359. By and through the acts described above, Defendants Adventist Health System-Sunbelt, Inc. and Fletcher Hospital, Inc. have knowingly presented or caused to be presented, false or fraudulent claims to the State of North Carolina in order to obtain Government reimbursement to which Defendants were not entitled for health care services provided under Medicaid and other state-funded health care programs.

360. By and through the acts described above Defendants Adventist Health System-Sunbelt, Inc. and Fletcher Hospital, Inc. knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

361. The State of North Carolina, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

362. By and through the acts described above, Defendants have knowingly concealed and improperly avoided an obligation to pay money to the Government, including specifically Defendants' obligation to report and repay past overpayments of Medicaid claims for which Defendants knew refunds were properly due and owing to the State of North Carolina.

363. The Government, unaware of the concealment by the Defendants, has not made demand for or collected the years of overpayments due from the defendants.

364. By reason of Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

365. Additionally, the State of North Carolina is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## Count VIII

### Tennessee Medicaid False Claims Act
### Tenn. Code Ann. § 71-5-182(1)(A)-(D)

366. Relators reallege and incorporate by reference the allegations contained in paragraphs 1-311 above as though fully set forth herein.

367. This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(1)(A)-(D).

368. By and through the acts described above, Defendants Adventist Health System-Sunbelt, Inc., Takoma Regional Hospital, Inc., Wellmont Health System, and Jellico Community Hospital, Inc. have conspired to and, in fact ,knowingly presented or caused to be presented, false or fraudulent claims to the State of Tennessee in order to obtain Government reimbursement to which Defendants were not entitled for health care services provided under Medicaid and other state-funded health care programs.

369. By and through the acts described above, Defendants Adventist Health System-Sunbelt, Inc., Takoma Regional Hospital, Inc., Wellmont Health System, and Jellico Community Hospital, Inc. have conspired to and, if fact, knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

370. The State of Tennessee, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

371. In addition, by and through the acts described above, Defendants have conspired to and, in fact, knowingly concealed and improperly avoided an obligation to pay money to the Government, including specifically Defendants' obligation to report and repay past

116

overpayments of Medicaid claims for which Defendants knew refunds were properly due and owing to the State of Tennessee.

372.    The Government, unaware of the concealment by the Defendants, has not made demand for or collected the years of overpayments due from the Defendants.

373.    By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

374.    Additionally, the State of Tennessee is entitled to the maximum penalty of up to $25,000, as adjusted under the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every violation alleged herein.

## Count IX

### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code Ann. § 36.002(1)-(2), (13)

375.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1-311 above as though fully set forth herein.

376.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.002(1)-(2), and (13).

377.    By and through the acts described above, Defendants Adventist Health System-Sunbelt, Inc. and Metroplex Adventist Hospital, Inc. have knowingly made or caused to be made false statements or misrepresentations of material facts to permit them to receive payments from the Texas Medicaid program that were not authorized or that were greater than the payments that were authorized.

117

378. By and through the acts described above, Defendants Adventist Health System-Sunbelt, Inc. and Metroplex Adventist Hospital, Inc. knowingly presented or caused to be presented to the Texas Medicaid program, claims that contained statements or representations the Defendants knew or should have known to be false.

379. By and through the acts described above, Defendants Adventist Health System-Sunbelt, Inc. and Metroplex Adventist Hospital, Inc. knowingly offered or paid, directly or indirectly, overtly or covertly, remuneration to induce persons to refer individuals to its own hospitals for the furnishing or services for which payment was made, in whole or in part, under the Texas Medicaid program.

380. By and through the acts described above, Defendants Adventist Health System-Sunbelt, Inc. and Metroplex Adventist Hospital, Inc. knowingly offered or paid, directly or indirectly, overtly or covertly, remuneration to induce persons to order or arrange for services from the Defendants for which payment was made, in whole or in part, under the Texas Medicaid program.

381. By and through the acts described above, Defendants Adventist Health System-Sunbelt, Inc. and Metroplex Adventist Hospital, Inc. knowingly concealed or failed to disclose information, thus permitting them to receive payments from the Texas Medicaid program that were not authorized or that were greater than the payments that were authorized.

382. The State of Texas, unaware of the falsity of all such claims and statements material to payments made, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendants' illegal conduct.

383. By reason of Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

118

384.    Additionally, the State of Texas is entitled to the maximum penalty of up to

$10,000 for each and every violation alleged herein ($15,000/violation if the violation results in

harm to an elderly person).

## PRAYER

WHEREFORE, plaintiffs pray for judgment against defendants as follows:

1. that defendants cease and desist from violating 31 U.S.C. § 3729 et seq.;

2. that this Court enter judgment against defendants in an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3. that this court enter judgment against defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of defendants' actions, plus a civil penalty of $11,000 for each violation of the Florida False Claims Act;

4. that this court enter judgment against defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of defendants' actions, plus a civil penalty of $11,000 for each violation of the Georgia Medicaid False Claims Act;

5. that this court enter judgment against defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of defendants' actions, plus a civil penalty of $11,000 for each violation of the Illinois False Claims Act;

6. that this court enter judgment against defendants in an amount equal to three times the amount of damages the State of North Carolina has sustained because of defendants' actions, plus a civil penalty of $11,000 for each violation of the North Carolina False Claims Act;

7. that this court enter judgment against defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of defendants'

120

actions, plus a civil penalty of $25,000 for each violation of the Tennessee Medicaid False Claims Act;

8. that this court enter judgment against defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of the Texas Medicaid Fraud Prevention Act;

9. that plaintiff be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act and the False Claims Act of the plaintiff States;

10. that plaintiff be awarded all costs of this action, including attorneys' fees and expenses; and

11. that the United States, the plaintiff States, and plaintiffs/relators recover such other and further relief as the Court deems just and proper.

121

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs hereby demand a trial by jury.

James F. Wyatt, III
Wyatt & Blake, LLP
435 E Morehead St
Charlotte, NC 28202
Tel: (704) 331-0767
Fax: (704) 331-0773
E-mail: jfw@wyattlaw.net

LEAD COUNSEL:

Peter W. Chatfield
Molly Beth Knobler
Phillips & Cohen, LLP
2000 Massachusetts Ave, N.W.
Washington, DC 20036
Tel: (202) 833-4567
Fax: (202) 833-1815
E-mail: peter@phillipsandcohen.com

ATTORNEYS FOR QUI TAM PLAINTIFFS